# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

MALIK WEATHERLY,     )
     )
     Plaintiff,     )
     )
     v.     )     Case No. 18-cv-00643
     )
     )
FORD MOTOR COMPANY,     )
     )
     Defendant.     )

---

## DEFENDANT FORD MOTOR COMPANY'S REPLY SUGGESTIONS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

**BERKOWITZ OLIVER LLP**

Timothy S. Millman, MO #44398
2600 Grand Boulevard, Suite 1200
Kansas City, Missouri 64108
Telephone:  (816) 561-7007
Facsimile:   (816) 561-1888
tmillman@berkowitzoliver.com

*Attorneys for Defendant Ford Motor Company*

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    FORD'S RESPONSE TO PLAINTIFF'S ADDITIONAL STATEMENT OF
       FACTS ................................................................................................................ 1

III.   LEGAL ARGUMENT ....................................................................................... 18

       A.    Plaintiff Waived and Released All Claims Against Ford Relating to His
             June 2017 Termination, Including Claims in Counts I, II, III, VI and VII. ......... 18

       B.    Plaintiff's Race Discrimination Claims Based on His June 11, 2017
             Termination (Counts VI & VII) Fail as a Matter of Law. .................................. 20

       C.    Plaintiff's Race Discrimination Claim Based on His October 18, 2017
             Termination (Count VII) Fails as a Matter of Law. ........................................... 23

       D.    Ford Did Not Interfere with Plaintiff's FMLA Rights (Count I). ..................... 24

       E.    Ford Did Not Retaliate Against Plaintiff Under the FMLA (Count II). ............. 25

       F.    Plaintiff Cannot Establish a Claim Under the MHRA that Ford Failed to
             Accommodate His Alleged Disability (Asthma – Count III). ............................. 25

             1.    Plaintiff's asthma was not a "disability" under the MHRA. ..................... 25

             2.    Plaintiff was not qualified to perform the essential functions of his
                   job. .......................................................................................................... 26

             3.    Plaintiff did not request an accommodation. ........................................... 26

       G.    Plaintiff's § 1981 Retaliation Claim (Count VIII) Fails as a Matter of Law. ....... 28

IV.    CONCLUSION .................................................................................................. 28

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Anderson v. Dillard's Inc.*, 109 F.Supp.2d 1116 (E.D. Mo. 2000)............................................. 12

*Davis v. Ford Motor Company*, Case No. 08-352-C, 2009 WL 577262,
 (W.D. Ky. March 5, 2009)...................................................................................................... 20

*Dewitt v. Southwestern Bell Tele. Co.*, 845 F.3d 1299 (10th Cir. 2017) ...................................... 27

*EEOC v. Product Fabricators, Inc.*, 763 F.3d 963 (8th Cir. 2014) .............................................. 27

*Forrest v. Kraft Foods, Inc.*, 285 F.3d 688 (8th Cir. 2002) .................................................... 23, 24

*Heuton v. Ford Motor Company*, 309 F.Supp.3d 714 (W.D. Mo. 2018) .............................. 25, 26

*Hill v. Kansas City Area Transp. Authority*, 181 F.3d 891 (8th Cir. 1999)........................... 25, 27

*Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040 (8th 2005) ...................................................... 27

*Lindeman v. Saint Luke's Hospital of Kansas City*, 899 F.3d 603 (8th Cir. 2018) ............... 22, 23

*Lovland v. Employers Mut. Cas. Co.*, 674 F.3d 806 (8th Cir. 2012) ............................................ 25

*McCray v. Chrysler LLC*, Case No. 4:09-CV-572, 2010 WL682306,
 (E.D. Mo. Feb. 23, 2010)......................................................................................................... 18

*Owens v. General Motors Corp.*, Case No. 4:04-cv-420, 2005 WL2172041
 (E.D. Mo. Sept. 7, 2005).......................................................................................................... 25

*Pappas v. Ford Motor Company*, Case No. 08-11490, 2009 WL 4730445,
 (E.D. Mich. Dec. 8, 2009)........................................................................................................ 20

*Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, (8th Cir. 2008) ........................................... 6, 11, 19

*Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899 (8th Cir. 2015) ................................ 27

*Spitzmueller v. Burlington Northern Railroad Co.*, 740 F. Supp. 671
 (D. Minn. 1990) ........................................................................................................................ 19

**Statutes**

29 U.S.C. § 2615(a)(2)................................................................................................................... 27

42 U.S.C. § 1981............................................................................................................................ 30

# I.     INTRODUCTION

Defendant Ford Motor Company ("Ford") submits these Reply Suggestions in Support of its Motion for Summary Judgment (Doc. 66) as to all remaining claims asserted by Plaintiff Malik Weatherly ("Plaintiff") and in response to Plaintiff's Opposition (Doc. 72).

# II.    FORD'S RESPONSE TO PLAINTIFF'S ADDITIONAL STATEMENT OF FACTS

1.     Upon his hiring, Plaintiff informed Ford of his asthma and scoliosis. Ex. 2, Deposition of Wesley Edwards ("Edwards Depo.") at 33:22-35:1; Ex. 10 (Weatherly Health History).

**FORD'S RESPONSE:**  Controverted in part as contrary to the record.  Plaintiff did not inform Ford that he had "scoliosis."  Rather, on the Health History Form dated 12/31/14, he merely checked "Yes" indicating that he now has or has ever had "Back trouble or back pain." Pl's Ex. 10.  Uncontroverted that Plaintiff checked "Yes" indicating he now has or has ever had "Asthma, wheezing or gasping."  Pl's Ex. 10.  Immaterial in that Plaintiff also answered "No" to the following questions: "24. Have you any physical complaints or disabilities at present?" … 25. Do you have conditions which may require a special work assignment?"  Pl's Ex. 10; *see also* PRSOF[1] 12 (uncontroverted).

2.     Plaintiff's asthma limits his ability to breathe. Ex. 1, Weatherly Depo. 81:1-12.

**FORD'S RESPONSE:**  Controverted in part as contrary to the record.  Plaintiff's asthma is sporadic, only limiting his ability to breathe when he is experiencing a flare-up.  Ford Ex. A, Weatherly Depo. 61:1-6; 81:1-9; *see also* PRSOF 13 (uncontroverted).

---

[1] "PRSOF" refers to Plaintiff's Response to Ford's Statement of Fact.  Beginning at PRSOF 136, plaintiff's paragraph numbering is off from Ford's original SOF by one number (*e.g.*, PRSOF 137 aligns with Ford's SOF 136 and so on).  Nonetheless, when citing to "PRSOF," Ford will refer to the numbers used by Plaintiff.  When Ford cites to "Ford's SOF," Ford is referring to its original SOF (Doc. 67).

3.      Plaintiff's asthma limited his ability to work at Ford. Ex. 1, Weatherly Depo. 82:3-7; 134:17-135:4. Certain working conditions and air quality at Ford exacerbated Plaintiff's asthma. *Id.*

**FORD'S RESPONSE:**   Controverted in part as not supported by the record and objection to the second contention. The testimony upon which Plaintiff relies describes missing only one day of work because, according to Plaintiff, fans in his work area were not working. Pl's Ex. 1, Weatherly Depo. 134:17-135:4. Other than a two-week restriction that began and ended in June 2016, Plaintiff has never maintained active work restrictions at Ford KCAP related to asthma. *See* PRSOF 23 (uncontroverted). Objection to the second contention as lacking foundation. Plaintiff has not supported the statement with any admissible testimony or documentation from a medical provider.

4.      On May 28, 2016, Plaintiff was deemed provisionally eligible for FMLA leave, which meant that Plaintiff's asthma-related absences "will be preliminarily considered FMLA protected, pending receipt of appropriate medical certification and/or verification that you timely provided notice of the need for FMLA leave." Ex. 5, Weatherly Affidavit at ¶4; ¶7; Ex. 11 (FMLA paperwork).

**FORD'S RESPONSE:**   Controverted in part as misleading and incomplete, but immaterial. Uncontroverted that the FMLA intermittent leave request was dated May 28, 2016, and contains the quoted language; however, the paperwork further provides that the "certification form and any additional requested information must be returned to the Company within 15 days." Pl's Ex. 11. Plaintiff did not return the certification form to Ford until June 24, 2016 – 27 days later. *Id.* (reflecting 6/24/16 date of receipt). Immaterial because Plaintiff's FLMA claim based on his June 2016 suspension has been dismissed as time-barred. *See* 03/28/19 Order, p. 5 (Doc. 58).

2

5.      On June 3, 2016, Plaintiff was unable to work because asthma. Ex. 5, Weatherly
        Affidavit at ¶5.

**FORD'S RESPONSE:**      Controverted as contrary to the record, but immaterial. Plaintiff's medical documentation dated June 8, 2016, which was completed by his personal doctor, establishes that as of June 8, 2016, Plaintiff had been unable to perform his work duties only from May 27, 2016 through May 31, 2016, and that he had been deemed "able to return to work" since May 31, 2016. Ford Ex. G, Weatherly Depo. 110:20-112:10, Weatherly Depo. Ex. 10. Immaterial because Plaintiff's FLMA claim based on his June 2016 suspension has been dismissed as time-barred. *See* 03/28/19 Order, p. 5 (Doc. 58).

6.      On June 6, 2016, Plaintiff was unable to work because asthma. Ex. 5, Weatherly
        Affidavit at ¶6.

**FORD'S RESPONSE:**      Controverted as contrary to the record, but immaterial. Plaintiff's medical documentation dated June 8, 2016, which was completed by his personal doctor, establishes that as of June 8, 2016, Plaintiff had been unable to perform his work duties only from May 27, 2016 through May 31, 2016, and that he had been deemed "able to return to work" since May 31, 2016. Ford Ex. G, Weatherly Depo. 110:20-112:10, Weatherly Depo. Ex. 10. Immaterial because Plaintiff's FLMA claim based on his June 2016 suspension has been dismissed as time-barred. *See* 03/28/19 Order, p. 5 (Doc. 58).

7.      Ford approved Plaintiff for FMLA leave for his asthma on June 24, 2016. Ex. 11
        (FMLA paperwork).

**FORD'S RESPONSE:**  Uncontroverted that on June 24, 2016, Plaintiff was approved for intermittent FMLA leave relating to asthma through the end of the calendar year – December 31, 2016. Ford Ex. A, Weatherly Depo. 159:2-13; Ex. 11.

3

8.  The effective date for the commencement of Plaintiff's FMLA intermittent FMLA was designated June 1, 2016. Ex. 11 (FMLA paperwork); Ex. 4, Hartung Depo. 48:24- 49:11.

**FORD'S RESPONSE:**  Uncontroverted, but immaterial.  Plaintiff's FLMA claim based on his June 2016 suspension has been dismissed as time-barred.  *See* 03/28/19 Order, p. 5 (Doc. 58).

9.  Ford did not excuse Plaintiff's June 3 and June 6, 2016 absence. Ex. 5, Weatherly Affidavit at ¶7.

**FORD'S RESPONSE:**  Controverted as misleading and contrary to the record, but immaterial.  Ford was not presented with a request to "excuse" Plaintiff's absences.  To the contrary, Plaintiff's own medical documentation dated June 8, 2016, which was completed by his personal doctor, establishes that he had been deemed "able to return to work" since May 31, 2016.  Ford Ex. G, Weatherly Depo. 110:20-112:10, Weatherly Depo. Ex. 10.  Immaterial because Plaintiff's FLMA claim based on his June 2016 suspension has been dismissed as time-barred.  *See* 03/28/19 Order, p. 5 (Doc. 58).  Plaintiff has also admitted that he does not claim that Ford violated or interfered with his FMLA rights with respect to his 2016 FMLA intermittent leave.  *See* PRSOF 52-53 (uncontroverted).

10.  Between December 2016 and April 2017, Plaintiff attempted to recertify his FMLA leave on multiple occasions. Ex. 1, Weatherly Depo. 157:18-158:22.

**FORD'S RESPONSE:**  Uncontroverted that, according to Plaintiff, he attempted to renew his intermittent FMLA leave for calendar year 2017 by making a request in December 2016, January 2017, February 2017 and March 2017.  *See* PRSOF 56 (uncontroverted).

11.  On June 10, 2017, Plaintiff suffered an asthma attack which prevented him from reporting to work at Ford. See Ex. 1, Weatherly Depo. 134:17-135:4.

4

**FORD'S RESPONSE:** Controverted as not supported by the record. Plaintiff has failed to support his contention with any medical documentation (or documentation of any kind) or medical testimony. *See* PRSOF 84 (uncontroverted).

12.     Plaintiff's supervisor had the discretion to code Plaintiff's June 10, 2017 absence as excused or chargeable. Ex. 2, Edwards Depo. 48:4-17; Ex. 3, Eads Depo. 35:21-36:3.

**FORD'S RESPONSE:** Controverted in part and misleading, but immaterial. Uncontroverted that Plaintiff's supervisor (Process Coach) had the initial responsibility to code Plaintiff AWOL on June 10 when Plaintiff did not show up for work, and that he would have had the discretion to cover Plaintiff, had Plaintiff asked him, by entering a non-chargeable code instead. Pl's Ex. 2, Edwards Depo. 48:4-17. Controverted insofar as the supervisor did not have the discretion to change the code after he entered it on June 10, 2017. Ex. H, Edwards Depo. 79:20-80:3; 137:7-15. Misleading and immaterial because Plaintiff did not ask his supervisor (Process Coach) before his shift on June 10, 2017, or at any time, to cover or excuse his absence on June 10, 2016. *See* PRSOF 83 (uncontroverted).

13.     Plaintiff could not have scheduled the absence off in advance because he did not know he was going to have an asthma attack on June 10, 2017. See Ex. A, Weatherly Depo. 133:17-134:4; Ex. 5, Weatherly Affidavit at ¶8.

**FORD'S RESPONSE:** Controverted as not supported by the record and misleading, but immaterial. Plaintiff has failed to support his contention that he had an asthma attack on June 10, 2017 with any medical documentation (or documentation of any kind) or medical testimony. *See* PRSOF 84 (uncontroverted). Further, Plaintiff has failed to identify any evidence in the record showing that he was somehow prevented from contacting his supervisor on June 10 in advance of the start of his shift, upon learning he would be missing work.

5

14. Upon arriving to work for his next shift, Plaintiff was told to report to Labor Relations. Ex. 1, Weatherly Depo. 135:20-23; Ex. 2, Edwards Depo. 136:21-25.

**FORD'S RESPONSE:** Controverted in part as not supported by the record. The cited testimony does not indicate that someone actually "told" Plaintiff to report to Labor Relations that day. Uncontroverted that *if* Plaintiff had gone to the plant floor on June 11, 2017, instead of reporting to Labor Relations, he would have been told to report to Labor Relations. Pl's Ex. 2, Edwards Depo. 136:21-25.

15. When Plaintiff reported to his shift on June 11, 2017, he disclosed to his committeeman and Josh Hartung that he had suffered an asthma attack which had caused him to miss work on June 10, 2017.

**FORD'S RESPONSE:** Controverted and objection as contrary to the record and Plaintiff's deposition testimony. Contrary to Rule 56, Plaintiff has failed to cite to any supporting materials, and thus his contention should be disregarded. Further, to the extent Plaintiff relies on an affidavit, Plaintiff's contention must still be disregarded. When asked during his deposition whether he said "anything" to Josh Hartung that he could recall, Plaintiff testified that "I think I just let him know I had time." Ford Ex. A, Weatherly Depo. 137:16-19. Plaintiff did not claim to have said anything to Mr. Hartung about allegedly suffering an asthma attack or missing work as a result. *Id.* Because there is no indication that Plaintiff was confused about the question at his deposition, and his affidavit does not help explain the contradiction, Plaintiff's post-deposition affidavit on this point must be disregarded. *See Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 498 (8th Cir. 2008) ("Post-deposition contradictory affidavits are admitted only when the prior deposition testimony shows confusion, and the subsequent affidavit helps explain the contradiction.").

6

16.     Ford did not excuse Plaintiff's June 10 absence—even though Plaintiff had accrued personal time off to utilize to cover it. Ex. 1, Weatherly Depo. 134:17-20; 135:20- 136:24; 137:7-24.

**FORD'S RESPONSE:** Controverted in part. Uncontroverted that Ford did not excuse Plaintiff's June 10 absence. The remainder is controverted because, under the NAP, Plaintiff's paid personal time off (excused absence allowance) could not be used to excuse his June 10 absence after-the-fact because he had discipline for absenteeism on his record. *See* PRSOF 92 (uncontroverted).

17.     Ford would have excused Plaintiff's June 10 absence if his Team Manager would have approved it pursuant to his discretion. Ex. 2, Edwards Depo. 139:1-4; 140:7-12.

**FORD'S RESPONSE:** Uncontroverted, but immaterial and speculative. Plaintiff never asked his Team Manager to excuse his absence. *See* PRSOF 95 (uncontroverted).

18.     Plaintiff was unaware that he could or had to petition to his Team Manager to get his June 10 absence excused. Ex. 5, Weatherly Affidavit at ¶14.

**FORD'S RESPONSE:** Uncontroverted that Plaintiff makes such claim in his declaration, but immaterial. Plaintiff's proclaimed lack of knowledge would not change the fact that it was Plaintiff's and/or his union representative's responsibility to petition the Team Manager for coverage of his absence, if Plaintiff had wanted to give it a try. Ford Ex. H, Edwards Depo. 137:25-138:25.

19.     The National Attendance Program is supposed to be applied equally and consistently to all employees at Ford. Ex. 2, Edwards Depo. 40:13-16.

**FORD'S RESPONSE:** Uncontroverted that the National Attendance Program is applied equally among all *hourly* employees. Pl's Ex. 2, Edwards Depo. 40:13-16.

7

20.     Ford hourly employees can request and be approved for time off from work in advance, and after-the-fact, even if they have no personal days to utilize. Ex. 3, Eads Depo. 35:10-36:3.

**FORD'S RESPONSE:**     Controverted in part as incomplete and misleading. Uncontroverted that hourly employees can ask their supervisor (Process Coach) in advance and be approved for time off from work, without pay, when they do not have personal days available. Pl's Ex. 3, Eads Depo. 35:7-24.  Regarding after-the-fact, hourly employees who have discipline on their record can ask their Process Coach (supervisor) to excuse an absence after-the-fact to avoid a penalty of two weeks or less.  Whether to excuse the absence after-the-fact is at the discretion of the Process Coach.  However, if the employee's next penalty is a one-month suspension or termination, the employee must get approval from his Team Manager (the Process Coach's supervisor) to excuse an absence after-the-fact.  Whether to excuse the absence after-the-fact is at the discretion of the Team Manager.  Ford Ex. B, Edwards Decl. ¶ 23.

21.     It is up to a supervisor's discretion whether to initially designate an employee's AWOL as excused or chargeable. Ex. 2, Edwards Depo. 48:11-17; Ex. 3, Eads Depo. 35:21- 36:3.

**FORD'S RESPONSE:**  Uncontroverted.

22.     There is no limit to the number of AWOLs that a supervisor is permitted to excuse. Ex. 2, Edwards Depo. 80:22-24.

**FORD'S RESPONSE:**  Uncontroverted.

23.     Supervisors are permitted to convert an "A" code (chargeable absence) to a "P" code. *Id*; Ex. 3, Eads Depo. 35:21-36:3. A supervisor has the discretion to do this in the event an employee has exhausted all paid time off. Ex. 2, Edwards Depo. 48:8-22; Ex. 3, Eads Depo. 35:21-36:3.

**FORD'S RESPONSE:** Controverted in part as overly broad and contrary to the record. Although a supervisor (Process Coach) has discretion to *initially* select the code to enter when the hourly employee fails to report to work, the supervisor does not have discretion to subsequently *convert* an already entered "A" code to a "P" code when the employee is up for one-month suspension or termination. Ford Ex. H, Edwards Depo. 79:20-80:3; 137:7-15; *see also* Ford Ex. B, Edwards Decl. ¶ 23 and PRSOF 37 (uncontroverted).

24.    An absence that is coded "P" be used to convert chargeable absences retroactively to "excused without pay." Ex. 3, Eads Depo. 40:7-19.

**FORD'S RESPONSE:** Controverted in part as overly broad, vague and confusing. Ms. Eads testified that the P code stands for "excused without pay," and that the code can be used in advance to schedule a day off without pay, the day of, or after-the-fact by changing an "A" code to a "P" code. Ford Ex. I, Eads Depo. 34:23-35:19; 40:8-19. However, to clarify, the supervisor (Process Coach) does not have discretion to subsequently *convert* an already entered "A" code to a "P" code when the employee is up for one-month suspension or termination. Ford Ex. H, Edwards Depo. 79:20-80:3; 137:7-15; *see also* Ford Ex. B, Edwards Decl. ¶ 23 and PRSOF 37 (uncontroverted).

25.    There are no guidelines in place for supervisors to follow when deciding whether or not to excuse an AWOL. Ex. 2, Edwards Depo. 48:8-22.

**FORD'S RESPONSE:** Uncontroverted.

26.    Unless otherwise converted to an excused absence, chargeable absences stay on an employee's attendance record for a minimum of twelve months. Ex. 2, Edwards Depo. 45:21-46:4; 47:6-12.

**FORD'S RESPONSE:** Uncontroverted.

27.     Ford's corporate representative testified that Ford follows the NAP "unless otherwise asked". Ex. 2, Edwards Depo. 137:18-138:3.

**FORD'S RESPONSE:**  Controverted as contrary to the record and mischaracterizing the cited testimony by omitting the witness's complete answer and instead taking the three quoted words out of context, which were clarified mid-answer.  The line of questioning concerned whether, when Plaintiff was up for discharge in June 2017, Labor Relations would have processed Plaintiff's discharge at that time "no matter what," in response to which (after an "overbroad" objection) the Ford representative testified that "We would have followed the national attendance program, unless otherwise asked – unless the absence would have been covered by the employee's team manager."  Pl's Ex. 2, Edwards Depo. 137:7-138:3.

28.     In July 2017, Plaintiff filed a charge of discrimination against Ford and Ford received notice of Plaintiff's charge in July 2017. Ex. 2, Edwards Depo. 77:6-9.

**FORD'S RESPONSE:**  Uncontroverted.

29.     Not all employees who are reinstated at Ford after termination are placed on probationary waivers. Ex. 2, Edwards Depo. 35:2-16.

**FORD'S RESPONSE:**  Uncontroverted.

30.     In July 2017, John Proden became aware that Plaintiff had filed a charge of discrimination against Ford. Ex. 2, Edwards Depo. 77:6-15.

**FORD'S RESPONSE:**  Uncontroverted.

31.     In October 2017, John Proden took part in the decision to reinstate Plaintiff's employment. Ex. 2, Edwards Depo. 77:18-78:9.

**FORD'S RESPONSE:**  Uncontroverted that John Proden took part in the decision to reinstate Plaintiff's employment.  Controverted as not supported by the cited record that the decision was made in October 2017.  Pl's Ex. 2, Edwards Depo. 77:18-78:9.

32.     Mr. Proden participated in the decision of whether Mr. Weatherly should be

        placed on a General Reinstatement Waiver. Ex. 2, Edwards Depo. 77:18-78:9.

**FORD'S RESPONSE:** Uncontroverted.

33.     Plaintiff was unable to negotiate the terms and conditions of his General

        Reinstatement Waiver. Ex. 5, Weatherly Affidavit at ¶10.

**FORD'S RESPONSE:** Controverted insofar as Plaintiff was represented by the UAW

which submitted and resolved the grievance on his behalf, and which process involves

negotiation between Ford and the UAW. *See* PRSOF 5, 96-97 (uncontroverted); Ford Ex. H,

Edwards Depo. 38:1-11.

34.     Plaintiff was not advised to consult with legal counsel prior to signing his

        waiver. Ex. 5, Weatherly Affidavit at ¶11.

**FORD'S RESPONSE:** Uncontroverted that Plaintiff's affidavit so states.

35.     In signing the waiver, Plaintiff did not understand that its terms could prevent him

        from pursuing remedies pursuant to state or federal anti-discrimination law or

        the FMLA. Ex. 5, Weatherly Affidavit at ¶12.

**FORD'S RESPONSE:** Controverted and objection as contrary to the record and

Plaintiff's deposition testimony. Regarding the "waive and release all rights" provision in

paragraph (a) of the General Reinstatement Waiver, Plaintiff unequivocally admitted that he

"understood" that provision and "agreed to it knowingly and voluntarily." Ford Ex. A,

Weatherly Depo. 149:21-150:14. Plaintiff made those admissions in the context of this lawsuit,

without objection, and with knowledge of Ford's position that the General Reinstatement Waiver

operated as a waiver and release of his claims – yet he did not qualify his admissions or claim

confusion or lack of understanding. Plaintiff cannot contradict his testimony now through a

declaration. *See Popoalii*, 512 F.3d at 498 ("Post-deposition contradictory affidavits are

11

admitted only when the prior deposition testimony shows confusion, and the subsequent affidavit helps explain the contradiction.").

36. From the time period through his June 2017 termination, Plaintiff was employed in the "truck chassis" department at Ford. He worked the third shift on the C Crew. Ex. 5, Weatherly Affidavit at ¶3.

**FORD'S RESPONSE:** Uncontroverted that Plaintiff was assigned to Truck – Chassis, C Crew, from February 2015 through his termination on June 11, 2017. Plaintiff was assigned to Transit – Chassis, B Crew, during his October 2017 employment. Pl's Ex. 5, Weatherly Affidavit at ¶ 13.

37. During the time frame April 1, 2017-April 1, 2018, forty (40) hourly employees who worked the third shift on the C-Crew in the truck chassis department incurred nine (9) or more chargeable absences each. Ex. 12 (Employee Absences).

**FORD'S RESPONSE:** Controverted as not supported by the record, misleading and incomplete, and objection based on lack of foundation, but immaterial. The contention lacks foundation because Pl's Ex. 12 is a document prepared by Plaintiff's attorney. *See* Pl's Amended Ex. 15. It consists of Plaintiff's counsel's analysis of 11,467 pages of raw absence data produced by Ford, at Plaintiff's request, without any supporting testimony from a knowledgeable witness. *See, e.g., Anderson v. Dillard's Inc.*, 109 F.Supp.2d 1116, 1121 (E.D. Mo. 2000) (striking attorney affidavit on summary judgment where attorney who received documents in discovery was not a person through whom the exhibits could be admitted into evidence).

Further, the contentions are not supported by the record, misleading, incomplete and immaterial for at least two reasons. *First*, merely counting the number of "A" codes reflected in

the raw absence data for an hourly employee does not establish whether those "A" codes or AWOLs were truly chargeable absences under the NAP. Ford explained this both at the time of the data's production and during Mr. Edwards' deposition. Specifically, when produced, Ford's counsel explained that the 11,467 pages of "data was pulled in a good faith effort to respond to your discovery requests; however, the enclosed is not a standard report that is relied on by the Company and we cannot represent that the data reflected is complete. Further, some absence codes are subject to change, such as if/when an employee who is currently inactive and/or on medical leave returns to work." Ford Ex. J, Millman Decl. ¶ 3, Ex. 1 (02/11/19 Letter).

Thereafter, in his deposition, Mr. Edwards explained that the raw absence data produced at Plaintiff's request is insufficient to determine whether the "A" codes reflected therein are truly chargeable absences under the NAP. Ford Ex. H, Edwards Depo. 54:1-57:2; Ford Ex. K, Edwards Second Decl. ¶ 10. For example, hourly employees who are initially coded AWOL ("A" code) by the floor supervisor may subsequently secure an approved medical leave covering those absences, but the "A" code is not necessarily changed in the system. *Id.* Mr. Edwards further explained that additional steps would need to be taken, and are taken by Labor Relations, to verify the absence information before administering discipline against an employee. Ford Ex. H, Edwards Depo. 56:8-57:24. When asked by Plaintiff's counsel "what other information would I have to look at to determine whether or not [the "A" codes in the absence data] were truly considered chargeable absences under the national attendance plan," Mr. Edwards explained that one would have to review the hourly employee's electronic medical record and the OHSIM system, to see whether that employee has an approved leave that would cover his AWOLs, as well as the employee's work record to see if the employee is on company rolls (active) or off company rolls (inactive). Ford Ex. H, Edwards Depo. 54:19-13; 56:8-57:2; Ford Ex. K, Edwards Second Decl. ¶ 11. Hourly employees who are inactive may have continued to

13

accumulate consecutive "A" codes (AWOLs) without being eligible for discharge under the NAP because they did not return to work. Ford Ex. K, Edwards Second Decl. ¶ 11.

Although Plaintiff's counsel acknowledged the necessary verification steps and indicated they were "a lot" (*id.* at Edwards Depo. 57:3), Plaintiff nonetheless created a list (Pl's Ex. 12) of forty (40) alleged comparators that is based merely on *counting* the number of "A" codes reflected in the raw absence data for those employees, without any verification that the "A" codes are truly chargeable – rendering the analysis meaningless and immaterial. Pl's Amended Ex. 15. Indeed, a review of just the employee leave histories, work histories and absence information for the five (5) hourly employees selected by Plaintiff at ASOF 39-41 (Employees 2002341, 1783710, 1898775, 1972375 and 1916181) establishes that they all had *less than* nine (9) full-day AWOL chargeable absences either in total *or* before the date their latest medical leave expired, after which the employee did not return to work such that he/she could not be disciplined under the NAP. Ford Ex. K, Edwards Second Decl. ¶¶ 12-20.

Second, even if the "A" codes were all chargeable absences, merely counting them, as Plaintiff has done, is insufficient to determine whether the employee was eligible for discharge under the NAP. Ford Ex. K, Edwards Second Decl. ¶ 9. This is because (a) hourly employees must be present at the plant to be administered discipline under the NAP, and (b) as explained in the NAP: "Discipline progression is based on the most recent attendance discipline penalty on record ***regardless of the number of chargeable absences***." Ford Ex. K, Edwards Second Decl. ¶¶ 5-9 (emphasis added). In other words, the next disciplinary penalty is not skipped over regardless how many consecutive days an employee is AWOL. *Id.* at ¶ 7. For example, regardless of whether an hourly employee in the attendance program incurs one (1) chargeable absence (AWOL) or nine (9) consecutive chargeable absences (AWOLs), when the employee returns to work, he or she will be administered the next progressive disciplinary penalty based on

that employee's discipline record. *Id.* at ¶ 8. Consequently, while an hourly employee must incur a minimum of (9) nine chargeable absences to incur the penalty of discharge under the NAP, employees can incur significantly more than nine (9) chargeable absences before becoming eligible for discharge under the NAP. *Id.* at ¶ 9. For these reasons, Plaintiff's contention is not supported by the record and must be disregarded.

38. Of the forty employees, only one[2] was terminated as a result of absenteeism. Ex. 12 (Employee Absences); See Exhibit 13 (Employee Discharges - Absenteeism). The employee who was terminated was African American and had incurred nine chargeable absences within the twelve-month time frame. Ex. 12 and Ex. 13.

**FORD'S RESPONSE:** Controverted as not supported by the record, misleading and incomplete, and objection based on lack of foundation, but immaterial. Although thirty-nine (39) of the employees selected by Plaintiff do not appear on the list of "NAP Discharges: 3-18-17 thru 11-13-18," as shown in Ford's Response to Plaintiff's ASOF 37, Plaintiff has failed to establish that *any* of the thirty-nine (39) hourly employees were in fact (a) eligible for the progressive penalty of discharge under the NAP, and/or even if eligible, (b) present at the plant to be administered the penalty of discharge under the NAP. *See* Ford's Response to ASOF 37; *see also* Ford Ex. K, Edwards Second Decl. ¶¶ 4-9. Further, Plaintiff has failed to establish which, if any, of the "A" codes for the listed hourly employees are truly chargeable absences under the NAP – further rendering the analysis meaningless and immaterial. *See* Ford's Response to ASOF 37. Additionally, although not discharged under the NAP (either because not eligible or not present), ten (10) of the nineteen (19) "white" hourly employees from Plaintiff's list were terminated as Ten-Day Quits for being AWOL. Ford Ex. K, Edwards Second Decl. ¶¶ 14, 17, 20, 21. Plaintiff's contention is further incomplete, misleading and immaterial insofar as Pl's Ex.

---

[2] Global employee ID #2023023.

13 reflects that forty-nine (49) "white" hourly employees were also discharged under the NAP between March 18, 2017 and November 13, 2018. Pl's Ex. 13; Ford Ex. K, Edwards Second Decl. ¶ 22.

39. Employee 2002341, Caucasian, incurred forty-two chargeable absences from April 1, 2017-April 1, 2018. Ex. 12.

**FORD'S RESPONSE:** Controverted as not supported by the record, misleading and incomplete, and objection based on lack of foundation, but immaterial. *See* Ford's Response to ASOF 37. As shown in Ford's Response to Plaintiff's ASOF 37, Plaintiff has failed to establish which, if any, of the "A" codes for the listed hourly employee are truly chargeable absences under the NAP. Ford Ex. K, Edwards Second Decl. ¶¶ 10-11; Ford Ex. H, Edwards Depo. 54:1-57:2. In reality, Employee 2002341 has only one (1) full-day AWOL chargeable absence between April 1, 2017 and July 20, 2017. *Id.* at ¶¶ 13-14. Then, the employee never returned to work after his July 20, 2017 medical leave expired and he was terminated as a Ten Day Quit effective September 12, 2017. *Id.*

Further incomplete, misleading and immaterial because Plaintiff's contention fails to indicate how many chargeable absences were consecutive (again, the next progressive discipline is administered if/when the employee returns to the plant, *regardless* of the number of chargeable absences), whether the employee was ever present at the plant after having become eligible for discipline under the NAP, and/or to identify the penalty level the employee was at under the NAP discipline progression when any chargeable absences were incurred. *See* Ford's Response to ASOF 37; *see also* Ford Ex. K, Edwards Second Decl. ¶¶ 4-9.

40. Employee 1783710, Caucasian, incurred twenty-nine chargeable absences from April 1, 2017-April 1, 2018. Ex. 12.

**FORD'S RESPONSE:** Controverted as not supported by the record, misleading and incomplete, and objection based on lack of foundation, but immaterial. *See* Ford's Response to ASOF 37. As shown in Ford's Response to Plaintiff's ASOF 37, Plaintiff has failed to establish which, if any, of the "A" codes for the listed hourly employee are truly chargeable absences under the NAP. Ford Ex. K, Edwards Second Decl. ¶¶ 10-11; Ford Ex. H, Edwards Depo. 54:1-57:2. In reality, Employee 1783710 has only three (3) full-day AWOL chargeable absences between April 1, 2017 and April 1, 2018. *Id.* at ¶ 15.

Further incomplete, misleading and immaterial because Plaintiff's contention fails to indicate how many chargeable absences were consecutive (again, the next progressive discipline is administered if/when the employee returns to the plant, *regardless* of the number of chargeable absences), whether the employee was ever present at the plant after having become eligible for discipline under the NAP, and/or to identify the penalty level the employee was at under the NAP discipline progression when any chargeable absences were incurred. *See* Ford's Response to ASOF 37; *see also* Ford Ex. K, Edwards Second Decl. ¶¶ 4-9.

41. Employees 1898775, 1972375, 1916181 incurred nineteen chargeable absences each from April 1, 2017-April 1, 2018. Ex. 12. None of these employees were issued any discipline for absenteeism pursuant to the NAP.

**FORD'S RESPONSE:** Controverted as not supported by the record, misleading and incomplete, and objection based on lack of foundation, but immaterial. *See* Ford's Response to ASOF 37. As shown in Ford's Response to Plaintiff's ASOF 37, Plaintiff has failed to establish which, if any, of the "A" codes for the listed hourly employees are truly chargeable absences under the NAP. Ford Ex. K, Edwards Second Decl. ¶¶ 10-11; Ford Ex. H, Edwards Depo. 54:1-57:2. In reality, Employee 1898775 has only seven (7) full-day AWOL chargeable absences between April 1, 2017 and February 26, 2018, including several that were consecutive days. *Id.*

at ¶¶ 16-17. Then, the employee never returned to work after her medical leave expired on February 26, 2018, and she was terminated as a Ten Day Quit effective March 21, 2018. *Id.* Employee 1972375 has only three (3) full-day AWOL chargeable absences between April 1, 2017 and April 1, 2018. *Id.* at ¶ 18. Employee 1916181 has only four (4) full-day AWOL chargeable absences between April 1, 2017 and March 9, 2018. *Id.* at ¶¶ 19-20. Then, the employee never returned to work after his medical leave expired on March 9, 2018, and he was terminated as a Ten Day Quit effective April 19, 2018. *Id.*

Further incomplete, misleading and immaterial because Plaintiff's contention fails to indicate how many chargeable absences were consecutive (again, the next progressive discipline is administered if/when the employee returns to the plant, *regardless* of the number of chargeable absences), whether the employees were ever present at the plant after having become eligible for discipline under the NAP, and/or to identify the penalty level the employees were at under the NAP discipline progression when any chargeable absences were incurred. *See* Ford's Response to ASOF 37; *see also* Ford Ex. K, Edwards Second Decl. ¶¶ 4-9.

Plaintiff also fails to cite to any material in the record in support of his contention that none of the three (3) employees were issued any discipline for absenteeism pursuant to the NAP. Notably, Pl's Ex. 13 is only a list of discharges under the NAP – not lessor disciplinary penalties. Employee 191618 was administered a disciplinary suspension under the NAP beginning January 2, 2018. Ford Ex. K, Edwards Second Decl. ¶ 19.

## III.    LEGAL ARGUMENT

### A.    Plaintiff Waived and Released All Claims Against Ford Relating to His June 2017 Termination, Including Claims in Counts I, II, III, VI and VII.

Plaintiff acknowledges that "[u]nder ordinary contract principles, the validity of a release depends on whether it was entered into voluntarily and knowingly." *McCray v. Chrysler LLC*, Case No. 4:09-CV-572, 2010 WL682306, *3 (E.D. Mo. Feb. 23, 2010). Plaintiff then relies on a

18

case applying Minnesota law to identify eight factors that courts have considered in determining whether a release was entered into knowingly and voluntarily. *See* Pl's Opp. at 46-47 (*citing Spitzmueller v. Burlington Northern Railroad Co.*, 740 F. Supp. 671, 675-76 (D. Minn. 1990)). But in doing so, Plaintiff attempts to downplay the undisputed facts that distinguish the present case from others: Plaintiff's deposition admissions.

Again, regarding the "waive and release all rights" provision in paragraph (a) of the General Reinstatement Waiver, Plaintiff unequivocally admitted that he "understood" that provision and "agreed to it knowingly and voluntarily." Ford SOF 103-107. Plaintiff made his admissions in the context of this lawsuit, without objection, and with knowledge of Ford's position that the General Reinstatement Waiver operated as a waiver and release of his claims – yet he did not qualify his admissions or claim confusion. No further analysis is necessary.

Nevertheless, Plaintiff argues that his admissions are not conclusive – relying on his post-deposition declaration to contend that he did not really understand the waiver's legal implications and was confused as to how it would impact his FMLA rights. But Plaintiff cannot create an issue of fact by contradicting his deposition testimony through a post-deposition declaration. *See Popoalii*, 512 F.3d at 498 ("Post-deposition contradictory affidavits are admitted only when the prior deposition testimony shows confusion, and the subsequent affidavit helps explain the contradiction.").

Additionally, even *if* Plaintiff's admissions were disregarded, six of the eight factors identified by Plaintiff weigh heavily in favor of enforceability. Plaintiff was provided *reinstatement* – clearly adequate consideration. And, Plaintiff has failed to present any evidence of Ford engaging in inequitable conduct in obtaining the release, the presence of fraud or misrepresentation, economic coercion, his own incompetence, or that the release is against a public policy. *Spitzmueller*, 740 F. Supp. at 676 (listing eight factors). Instead, Plaintiff focuses

on two factors – lack of legal counsel and not being allowed to negotiate terms. However, Plaintiff was represented by the UAW, which resolved the grievance on his behalf, and which process involves negotiation between Ford and the UAW. PRSOF 5, 96-97 (uncontroverted). The UAW let him know about the reinstatement waiver, attended the reinstatement meeting with him, and was available to answer any questions. PRSOF 99, 102 (uncontroverted)

Finally, Plaintiff's argument that the waiver might be ineffective because it did not specifically identify Plaintiff's Charge ignores relevant case law. In *Pappas v. Ford Motor Company*, Case No. 08-11490, 2009 WL 4730445, *4 (E.D. Mich. Dec. 8, 2009), the court held that a nearly identical reinstatement waiver need not specifically list each and every right being waived in order to be effective. The *Pappas* court's holding is in line with other courts that have enforced similar waiver language in grievance settlements and separation agreements. *See, e.g., Davis v. Ford Motor Company*, Case No. 08-352-C, 2009 WL 577262, *2 (W.D. Ky. March 5, 2009) ("The phrase 'I waive and release any and all rights or claims I may have against the Ford Motor Company' is broad and includes the plaintiff's present Title VII claim.").

### B. Plaintiff's Race Discrimination Claims Based on His June 11, 2017 Termination (Counts VI & VII) Fail as a Matter of Law.

Plaintiff's sole argument is that Ford does not consistently enforce the NAP when it comes to white employees. Without relying on testimony from a knowledgeable witness, Plaintiff merely counted the number of "A" codes reflected in raw absence data for hourly employees who worked in Truck-Chassis, C Crew, to conclude that forty (40) employees – white, black and multiple races – incurred nine (9) or more chargeable absences, such that they all should have been terminated, but only one (1) was. But Plaintiff's counting analysis is severely flawed, not supported by evidence, and ultimately inaccurate and immaterial for at least two primary reasons.

**First**, merely counting the number of "A" codes (AWOLs) reflected in the raw absence data for an hourly employee does not establish whether those "A" codes or AWOLs were truly chargeable absences under the NAP. FRASOF[3] 37-38. At a minimum, hourly employees who are initially "A" coded by the floor supervisor may subsequently secure an approved medical leave covering those absences, but the "A" code is not necessarily changed in the system. *Id.* For this and other reasons, Labor Relations takes additional steps to *verify* the absence information before administering discipline against an employee. *Id.*

Indeed, when asked by Plaintiff's counsel "what other information would I have to look at to determine whether or not [the "A" codes in the absence data] were truly considered chargeable absences under the national attendance plan," a Ford witness explained that one would have to review the hourly employee's medical leave history to see whether that employee has an approved leave that would cover his AWOLs, as well as the employee's work record to see if the employee is on company rolls (active) or off company rolls (inactive). FRASOF 37. Hourly employees who are inactive may have continued to accumulate consecutive "A" codes without being eligible for discharge under the NAP because they did not attempt to return to work.[4] *Id.* Despite being so informed, Plaintiff has nonetheless created a list (Pl's Ex. 12) of forty (40) alleged comparators that is based merely on *counting* the number of "A" codes reflected in the raw absence data for those employees, without *any* verification that the "A" codes are truly chargeable – rendering the evidence inaccurate, inadmissible and immaterial. *Id.*

**Second**, even if the "A" codes were all chargeable absences, merely counting them, as Plaintiff has done, is insufficient to determine whether the employee was eligible for discharge under the NAP. FRASOF 37. This is because (a) hourly employees must be present at the plant

---

[3] "FRASOF" refers to Ford's Response to Plaintiff's Additional Statement of Fact.
[4] Indeed, although not discharged under the NAP (because either not eligible or not present), ten (10) of the nineteen (19) "white" employees on Pl's Ex. 12 were terminated as Ten-Day Quits. FRASOF 38.

to be administered discipline under the NAP, and (b) as explained in the NAP: "Discipline progression is based on the most recent attendance discipline penalty on record *regardless of the number of chargeable absences*." *Id.* (emphasis added). In other words, the next disciplinary penalty is not skipped over regardless how many consecutive days an employee is AWOL. *Id.* Consequently, while an hourly employee must incur a minimum of (9) nine chargeable absences to incur the penalty of discharge under the NAP, employees can incur significantly *more than* nine (9) chargeable absences before becoming eligible for discharge under the NAP. *Id.* For these reasons, Plaintiff's argument and purported evidence must be disregarded.

Further, even if Plaintiff's counting of "A" codes was a valid analysis, Pl's Ex. 12 would reflect that nineteen (19) white and (18) black hourly employees were *not* discharged for absenteeism under the NAP. This nearly even split between white and black employees is not statistical evidence of pretext or disparate treatment. Moreover, Pl's Ex. 13 reflects that forty-nine (49) "white" hourly employees were discharged under the NAP between March 18, 2017 and November 13, 2018 – disproving Plaintiff's argument that Ford deviates from the NAP for white employees.

Finally, even if the "A" codes were all chargeable absences under the NAP, Plaintiff has still failed to establish that *any* of the white hourly employees on Pl's Ex. 12 were similarly situated to him. To be similarly situated, Plaintiff must show that "he and the more leniently treated employees have comparable disciplinary history[ies]" and that they "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Lindeman v. Saint Luke's Hospital of Kansas City*, 899 F.3d 603, 606 (8th Cir. 2018) (quotations omitted). For the alleged comparators, Plaintiff has failed to present evidence showing (a) how many chargeable absences were consecutive (again, the next progressive discipline is administered if/when the employee returns

to the plant), (b) whether the employee was ever present at the plant after having become eligible for discipline under the NAP, and/or (c) the penalty level the employee was at under the NAP discipline progression when any chargeable absences were incurred. *See Lindeman,* 899 F.3d at 606 (plaintiff's failure to present evidence that comparators were "at the last stage of the progressive disciplinary policy" was "fatal to his argument"); FRASOF 37-38.

Plaintiff has also failed to present evidence that the purported comparators dealt with the same supervisor as Plaintiff did in Truck-Chassis (or even who his supervisor was) and/or that the same decision-maker, Joshua Hartung, was involved in determining whether to administer discipline against any of the other employees. *See Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 692 (8th Cir. 2002) ("When different decision-makers are involved, two decisions are rarely 'similarly situated in all relevant respects.'"). Finally, Plaintiff has failed to come forward with any evidence that the reason for Plaintiff's termination – absenteeism – was false and that, instead, the decision-maker, Mr. Hartung, was motivated by a discriminatory animus.

## C. Plaintiff's Race Discrimination Claim Based on His October 18, 2017 Termination (Count VII) Fails as a Matter of Law.

Regarding his October 18 termination, Plaintiff simply incorporates his argument from the above-section to argue that a reasonable inference can be drawn, from the same attendance and discipline data, that white employees are treated more leniently than black employees, and that Plaintiff would not have been terminated had he been white. For the same reasons established above in Section B, there is absolutely no admissible evidentiary support for such inferences. Additionally, Plaintiff's reliance on counting "A" codes is even more misguided here because he was assigned to Transit-Chassis, B Crew, in October 2017, whereas Pl's Ex. 12 involves hourly employees from a different vehicle, area and crew/shift. FRASOF 36.

Further, Plaintiff has failed to present evidence that the purported comparators dealt with the same supervisor as Plaintiff did in Transit-Chassis (Aaron Pennington), that the same

23

decision-maker, Ms. Eads, was involved in determining whether to administer discipline against any of the other employees, and/or that any of the purported comparators were on a General Reinstatement Waiver. *See Forrest*, 285 F.3d at 692 ("When different decision-makers are involved, two decisions are rarely 'similarly situated in all relevant respects.'"). Finally, Plaintiff has failed to come forward with any evidence that the reason for Plaintiff's termination – absenteeism/violation of waiver – was false and that, instead, the decision-maker, Ms. Eads, was motivated by a discriminatory animus.

### D. Ford Did Not Interfere with Plaintiff's FMLA Rights (Count I).

Plaintiff does not dispute that he fell short of the 1,250-hour threshold to renew his intermittent FMLA leave for calendar year 2017. Instead, Plaintiff argues that Ford should have excused his absences on June 3 and June 6, 2016, because they were ultimately covered by the FMLA when Ford approved him for intermittent FMLA on June 24, 2016. Plaintiff speculates that had Ford excused his two absences in June 2016, he "likely" would not have suffered a suspension in June 2016, and would "likely" have accrued enough hours for subsequent FMLA eligibility in 2017. Plaintiff's argument fails for several reasons.

*First*, Plaintiff's argument requires a finding that Ford unlawfully interfered with Plaintiff's FMLA rights by suspending him in June 2016 in lieu of excusing his absences. But Plaintiff's FLMA claim based on his June 2016 suspension has already been dismissed as time-barred. *See* 03/28/19 Order, p. 5 (Doc. 58). *Second*, Ford was not presented with a request to "excuse" Plaintiff's June 3 or June 6 absences. To the contrary, Plaintiff submitted medical documentation dated June 8 establishing that he had been deemed "able to return to work" by his own doctor since May 31, 2016. FRASOF 5-6, 9; *see also* PRSOF 52-53 (uncontroverted). *Third*, Plaintiff's argument that he "likely" would not have been suspended and "likely" would have accrued enough hours to be eligible in 2017 involves two levels of improper speculation.

### E. Ford Did Not Retaliate Against Plaintiff Under the FMLA (Count II).

Plaintiff's Opposition offers only general statements of the law, but then his argument simply ends, with no substantive discussion or application of the law to the facts of the case. Pl's Opp. at 52-53. Again, in addition to the lack of a sufficient temporal proximity, Plaintiff has failed to come forward with any other evidence showing a causal connection. Plaintiff has also failed to come forward with any evidence that Ford's legitimate, non-retaliatory reasons for the disciplinary actions taken (absenteeism) were phony, and that the decision-makers were instead motivated by an FMLA retaliatory animus. *See Lovland v. Employers Mut. Cas. Co.*, 674 F.3d 806, 811 (8th Cir. 2012) (a "retaliation claim under § 2615(a)(2) requires proof of an impermissible discriminatory animus").

### F. Plaintiff Cannot Establish a Claim Under the MHRA that Ford Failed to Accommodate His Alleged Disability (Asthma – Count III).

Plaintiff contends that in "failing to excuse the absence he incurred on June 10, 2017, Ford failed to reasonably accommodate him." Pl. Opp. at 53. That contention is without merit.

#### 1. Plaintiff's asthma was not a "disability" under the MHRA.

Plaintiff attempts to distinguish *Owens v. General Motors Corp.*, Case No. 4:04-cv-420, 2005 WL2172041, *4 (E.D. Mo. Sept. 7, 2005) (asthma not a disability), and related Federal case law, by pointing out that Congress amended the ADA in 2008. Plaintiff is misguided. Although the definition of "disability" under the ADA was broadened in 2008, the MHRA did not follow suit, and instead continues to follow pre-ADA amendment Federal case law. *Heuton v. Ford Motor Company*, 309 F.Supp.3d 714, 715-16 (W.D. Mo. 2018). Thus, Plaintiff's argument – that the episodic nature of his asthma, which he can control with inhalers, is not relevant to the issue of disability – is not only wrong, but it proves the *opposite*: that his asthma was *not* a disability under applicable pre-2008 case law. *See, e.g.*, *Owens*, 2005 WL2172041, *4; *Hill v. Kansas City Area Transp. Authority*, 181 F.3d 891, 894 (8th Cir. 1999) (plaintiff's

"hypertension is not a disability because, 'when medicated [her] high blood pressure does not substantially limit [her] in any major life activity'"). Further, Plaintiff's contention that his major life activity of employment/working was impacted because his ability to work in his *specific job* at Ford was limited is insufficient. *See Heuton*, 309 F.Supp.3d. at 716 (under the MHRA, a disability relating to working requires "'an inability to work in a broad range of jobs, rather than a specific job'"). Plaintiff has failed to establish that his asthma was a "disability."

### 2. Plaintiff was not qualified to perform the essential functions of his job.

Plaintiff argues that regular and reliable attendance was not an essential function of his hourly production job at Ford because Pl's Ex. 12 shows that his co-workers far exceeded the chargeable absence limit under the NAP without punishment. However, as explained above in Section B, Plaintiff's mere counting of "A" codes in the raw absence data is meaningless – it does not establish whether an absence was chargeable, how many chargeable absences were consecutive, whether the employee was eligible for termination in the discipline progression, and/or whether the employee was present to be disciplined. FRASOF 37-38. Plaintiff's argument also ignores the 113 discharges under the NAP over a twenty-month period reflected in Pl's Ex. 13, as well as the use of Ten Day Quits to address no shows. FRASOF 38. Further, Plaintiff's conclusion of "overwhelming" absenteeism cannot be drawn because he has failed to compare/contrast his figures to the total number of employees at KCAP and/or in Truck-Chassis. Finally, Plaintiff's argument that supervisors are afforded unfettered discretion to excuse absences after-the-fact (if asked) is immaterial because he has failed to provide any evidence regarding how frequently that discretion is actually exercised.

### 3. Plaintiff did not request an accommodation.

Plaintiff's argument that Ford could have reasonably accommodated him by excusing his June 10 AWOL *after-the-fact* misses the point and remains fundamentally flawed. *First*, a

26

request to provide a reasonable accommodation is "always prospective," and "an employer is not required to excuse past misconduct even if it is the result of the individual's disability." *Dewitt v. Southwestern Bell Tele. Co.*, 845 F.3d 1299, 1316 (10th Cir. 2017) (requesting "retroactive leniency" is not a request for a reasonable accommodation) (quotations omitted); *see also Hill*, 181 F.3d at 894 (requesting a "second chance" is not a request for an accommodation); *Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899, 906 (8th Cir. 2015) (same). Here, it is undisputed that Plaintiff's purported request (assuming he ever made one) was not "prospective;" that is, he did not prospectively ask for an accommodation that would enable him to perform his job. Instead, his argument is based solely on a request for "retroactive leniency."

*Second*, although the request need not be overly detailed, a request for an accommodation is required. *See EEOC v. Product Fabricators, Inc.*, 763 F.3d 963, 971 (8th Cir. 2014) ("'the predicate requirement triggering the interactive process is the employee's request for the accommodation'"); *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th 2005) ("A mere assertion that an accommodation [is] needed is insufficient; the employee must inform the employer of the accommodation needed."). Here, Plaintiff made no request whatsoever, either prospectively or during the termination meeting on June 11. Instead, he just mentioned that he believed he had personal time available (which, given his discipline history, could not be used). Ford SOF 94. Plaintiff submitted no medical documentation covering his absence or indicating it was asthma-related (and still hasn't) (PRSOF 84), there was no discussion about asthma (Ford SOF 94), and he did not ask his Team Manager to excuse his absence after-the-fact (PRSOF 95). His claim that he did not know he could ask his Team Manager is immaterial.

Finally, even if Plaintiff could establish elements (1) and (2) under the MHRA analysis, he has failed to come forward with any evidence establishing element (3) – that Ford terminated him on June 11, 2017 "because of [his] disability." Rather, Ford had a legitimate, non-

27

discriminatory reason for Plaintiff's termination (absenteeism under the NAP), and Plaintiff has failed to show this reason was a pretext for disability discrimination.

### G. Plaintiff's § 1981 Retaliation Claim (Count VIII) Fails as a Matter of Law.

Plaintiff offers only a two-sentence opposition to Ford's argument. Plaintiff asserts that a genuine issue of material fact exists as to "whether black employees are treated differently than white employees" – but that misses the point. Pl's Opp. at 57. The relevant comparison for a retaliation claim would be persons who participated in *protected activity* compared to those who did not. On this point, Plaintiff has failed to come forward with any evidence. Further, Plaintiff failed to address Ford's argument that because Plaintiff was reinstated *after* he filed his Charge, any causal connection was broken. And, he ignores a determinative factor – that the decision-maker, Ms. Eads, lacked knowledge of the Charge. Finally, Plaintiff has failed to present *any* evidence that the reason for his termination in October 2017 was false and that, instead, Ms. Eads was motivated by a retaliatory animus.

## IV. CONCLUSION

For all the foregoing reasons, summary judgment should be granted in favor of Ford.

Dated: June 26, 2019                    Respectfully submitted,

                                        **BERKOWITZ OLIVER LLP**


                                        By: */s/ Timothy S. Millman*
                                              Timothy S. Millman, MO Bar # 44398
                                              2600 Grand Boulevard, Suite 1200
                                              Kansas City, Missouri 64108
                                              Telephone:  (816) 561-7007
                                              Facsimile:   (816) 561-1888
                                              Email:        tmillman@berkowitzoliver.com

                                        ***Attorneys for Defendant***

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which serves notice of the same on the following counsel of record:

Joshua P. Wunderlich
Megan L. Stiles
Cornerstone Law Firm
8350 N. St. Clair Ave.
Suite 225
Kansas City, Missouri 64151

***Attorneys for Plaintiff***

_____*/s/ Timothy S. Millman*_____
***Attorney for Defendant***