## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| MALIK WEATHERLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.: 18-CV-00643-FJG |
| | ) | |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

# ORDER

Currently pending before the Court is Defendant Ford Motor Company ("Ford's")
Motion for Summary Judgment as to all remaining claims asserted by Plaintiff in his
First Amended Complaint (Doc. # 66) and Plaintiff's Motion for Leave to File a Sur-
Reply in Opposition to Defendant's Motion for Summary Judgment (Doc. # 77).

## I. BACKGROUND

Plaintiff is a 23 year old black male who began working at Ford's Kansas City
Assembly plant ("KCAP") as an assembly-line worker in January 2015. Plaintiff was
assigned to the bumper flap install job in the Final Area on the (F-150) Truck side of the
plant. Plaintiff was a member of the United Auto Workers' union and the terms and
conditions of his employment were governed by national and local collective bargaining
agreements. The KCAP Labor Relations Department is a subset of the Human
Resources Department that is responsible for matters of hourly employee attendance
and discipline. Labor Relations also administers FMLA leave for hourly employees.
Joshua Hartung was a Labor Relations Associate at the KCAP from June 2015 through
June 2017. Kimberly Eads has been employed as a Labor Relations Associate at KCAP

since July 2017.

Plaintiff alleges that he suffers from asthma and scoliosis. Plaintiff's asthma is sporadic, it can flare up depending on his environment, causing constriction in his lungs which results in wheezing. When his asthma flares up, his inhaler or breathing treatment alleviates his symptoms most of the time. Other than when he is having a flare-up, plaintiff's asthma does not limit his ability to work and plaintiff has never maintained active work restrictions related to his asthma. The Ford-UAW collective bargaining agreement includes the National Attendance Program ("NAP") which establishes the collectively bargained agreement and rules relating to hourly employee attendance and discipline. The NAP follows a schedule of progressive discipline for chargeable absences. Chargeable absences include AWOL's ("Absence Without Leave") –"A" Code; Temporary Illness/Injuries- absences of less than 3 days relating to a temporary illness or injury ("T" Code). If an employee misses 3 or more consecutive days for medical reasons, where a medical leave has not been approved and is unpaid and the absences is not approved under FMLA or workers' compensation, this will result in 2 chargeable absences which are coded as "MC." An employee's supervisor will assign an "A" code in the time-keeping system for AWOL when an hourly employee does not report for work and has not pre-scheduled time off and is not on a medical leave of absence. The supervisor has discretion to convert a chargeable absence into an excused absence if the employee has exhausted all paid time off. Under the NAP, attendance related discipline progresses from R&W (reprimand and warning) plus one day suspension for the 5th chargeable absence to R&W plus one week suspension for the 6th chargeable absence to R&W plus two weeks for the 7th chargeable absence to

2

R&W plus one month for the 8th chargeable absence to termination for the 9th chargeable absence. Attendance discipline remains on an employee's record for 18 months (extended by personal medical leaves of absence that occur during that period). Any additional discipline within this 18 month time period progresses from the most recent disciplinary penalty. Employees who incur an AWOL or other chargeable absence (except "MC" codes) and who have excused absence allowance time available (paid personal time) can use such time after-the-fact to excuse their absence if the employee has no discipline for absenteeism on their record at the time of the absence. Employees who have discipline on their record can also ask their supervisors to excuse an absence after-the-fact to avoid a penalty of two weeks or less. The decision of whether to excuse an absence is left to the supervisor's discretion. If the employee's next level of penalty is a one month suspension or termination, the employee must receive approval from a higher level supervisor in order to excuse the absence after the fact.

Employees who need to take three or more consecutive days off for medical reasons can open a medical leave of absence through Ford's third-party disability benefits administrator, Unicare. The employee must request a medical leave of absence from Unicare within 5 days of his last date of work. If satisfactory documentation substantiating the leave is not supplied to Unicare within 14 days of the employee's last day of work, the medical leave of absence will not be approved. Plaintiff opened medical leaves of absence on three occasions – May 2016, February 2017 and April 2017.  Ford administers FMLA leave on a calendar year basis.  All intermittent leaves of absence end at the close of the calendar year during which they were granted and commenced.

3

Hourly employees seeking FMLA leave in a new calendar year must have worked 1,250 hours within the 12 months preceding the commencement of the leave. On May 28, 2016 plaintiff requested intermittent FMLA leave. On June 24, 2016, plaintiff was approved for intermittent FMLA leave relating to his asthma retroactively to June 1, 2016 through December 31, 2016. Plaintiff attempted to renew his intermittent FMLA leave for calendar year 2017 at the end of 2016, and also in January, February and March 2017. In response to each request, plaintiff was told that he did not have enough in-plant hours to qualify. Plaintiff did not meet the 1,250 hour requirement at any time in calendar year 2017 and so was not eligible for intermittent FMLA leave at any time in 2017.

In May 2015, plaintiff began experiencing difficulty with managing the symptoms of his asthma, so he completed accommodation paperwork and provided it to Ford. Between May 1, 2015 and May 1, 2016, Ford excused plaintiff from working on days when he suffered from asthma complications. On May 1, 2016, plaintiff became eligible for FMLA leave. On May 28, 2016, plaintiff submitted his medical certification forms for intermittent FMLA leave to Ford's Labor Relations department. On June 3, 2016, plaintiff suffered an asthma attack and missed two days of work. Plaintiff notified Ford of his attack and his inability to work. When plaintiff attempted to return to work, Ford told plaintiff that he was suspended for thirty days because he had accrued too many attendance points.

Plaintiff was absent from work beginning April 1, 2017. He contacted Unicare on April 4, 2017 to initiate a claim and request a medical leave of absence. Plaintiff received a letter from Unicare dated April 12, 2017 notifying him that they had not

received the medical information necessary for his claim and that he needed to supply the medical documentation to verify his medical leave of absence within 14 calendar days of his last day of work. Plaintiff received a letter from Unicare dated April 17, 2017 notifying him that his claim had been denied because Unicare had not received his medical documentation. On April 23, 2017, Joshua Hartung issued plaintiff an R&W plus a one month suspension for absenteeism. Because more than 9 months had passed since his last discipline on record, plaintiff repeated the penalty of a one month suspension instead of termination.  On  April 24, 2017, plaintiff had his union fax medical documentation from his physician to Unicare reflecting that he was unable to perform work duties from April 1 through April 8, 2017 and that he was able to return to work on April 9, 2017. While he was on suspension, plaintiff received a letter from Unicare dated May 1, 2017 reflecting that his medical leave of absence was approved through April 8, 2017, consistent with the medical information received from his doctor. Because plaintiff was supposed to return to work on April 9, 2017, but did not return until April 15, 2017, he incurred two chargeable absences for April 9 and 10, 2017. Plaintiff served his one month suspension from April 23, 2017 to May 25, 2017, returning to work on May 26, 2017. On June 10, 2017, plaintiff called in sick due to an asthma attack. On June 11, 2017, when plaintiff attempted to return to work, Labor Relations informed him that his employment had been terminated due to absenteeism. Josh Hartung and plaintiff's union representative explained to plaintiff that he could not use personal time to excuse his absence because he had just returned from a suspension for absenteeism. Ford would have excused the June 10, 2017 absence if his Team Manager would have approved it, but plaintiff never requested that it be

5

excused because he was unaware that he could have or had to ask his Team Manager to excuse his absence. Hourly employees who have discipline on their record can ask their Supervisors to excuse an absence after-the-fact to avoid a penalty of two weeks or less. However, if an employee's next penalty is a one-month suspension or termination, the employee must get approval from his Supervisor's supervisor (the Team Manager) to excuse an absence after the fact.

In June 2017, the UAW submitted a grievance on plaintiff's behalf, grieving his termination. In July 2017, plaintiff filed a Charge of Discrimination against Ford. Ford and the UAW agreed to resolve the grievance by reinstating plaintiff on a reinstatement waiver. On October 2, 2017, plaintiff went to the KCAP and voluntarily signed a General Reinstatement Waiver. The waiver stated in part:

> In consideration of my reinstatement, without loss of seniority, as an employee of the Ford Motor Company, I hereby agree as follows:
> a) I waive and release all rights, including back pay, which I may have for the period beginning with my termination and ending with my reinstatement . . .
> d) I shall be regarded, for disciplinary purposes, as being on probation for a period of twelve (12) months (excluding ALL time off) and understand that I will not have access to the grievance procedure to protest the reasonableness of any penalty, including discharge, I may receive during this period for an infraction of Company rules or misconduct . . .

Plaintiff's union representative was present when plaintiff signed the General Reinstatement Waiver and was available to answer any questions that plaintiff had regarding the waiver. Plaintiff had an opportunity to review the waiver before he signed it. It was plaintiff's understanding that if missed a day due to a medical condition and brought in a doctor's note, the only consequence would be a prolonging of his probationary period.

6

On October 3, 2017, plaintiff returned to work at the KCAP. However, plaintiff could not return to his previous position and instead was assigned to work in the Final Area on the Transit side of the plant. On October 16, 2017, plaintiff could not complete his shift due to back pain. After completing 7 hours of his scheduled 10 hour shift, plaintiff obtained a pass from his supervisor to go to Plant Medical. Plaintiff told Plant Medical that his back hurts from time to time and it started hurting worse that day and he needed to go to the doctor. Plaintiff then left Plant Medical and informed his supervisor that he was going home and that he needed to go to his physician to get restrictions for his scoliosis. On the afternoon of October 17, 2017, plaintiff provided a doctor's note to Plant Medical stating that he was unable to work on October 16 and 17, 2017 and could return to work on October 18, 2017. The doctor's note included a diagnosis of lumbar scoliosis and listed a series of restrictions. Plant Medical gave plaintiff a short-term medical justification slip checking the box for "time off justified" for 10/16 BOS (balance of shift) and 10/17/17. When an employee is absent for a medical reason or if they left work during their shift, the employee has to clear through Plant Medical when they return. Plant Medical gives them a short-term medical justification slip to give to Labor Relations to show that the employee cleared through Plant Medical. Plaintiff understood that an absence for temporary illness or injury with a doctor's note, was a chargeable absence under the NAP. On October 18, 2017, when plaintiff reported to Labor Relations to clear to return to work, Labor Relations representative Kim Eads made the decision to terminate plaintiff's employment for violation of the General Reinstatement waiver. Ms. Eads documented the termination in a Disciplinary Action Report which stated: "Mr. Weatherly was awol 10/17/17. He is on a waiver. Mr.

7

Weatherly thought a Dr. note would cover his absence."

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. 242, 248 (1986).  In Matsushita Electric  Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court emphasized that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial.  In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence.  Matsushia, 475 U.S. 574, 588; Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

## III. DISCUSSION

### A. Plaintiff's Motion for Leave to File Sur-Reply

In opposing Ford's Motion for Summary Judgment, plaintiff relied on evidence of Ford's treatment of other employees who incurred excessive chargeable absences

Case 4:18-cv-00643-FJG   Document 82   Filed 03/26/20   Page 8 of 34

under the NAP, but who were not terminated. Plaintiff argues that the attendance data produced by Ford contains proof that Ford did not administer the NAP in an even handed manner. Plaintiff's counsel submitted an affidavit in connection with the exhibit which provided a summary of the methods used to create the exhibit. In its reply brief, Ford challenged the validity and evidentiary value of the data, arguing that the Court should disregard it because it lacks foundation and is unreliable. Plaintiff seeks in the instant Motion for Leave to File a Sur-Reply, an opportunity to respond to Ford's evidentiary objections. For good cause shown, the Court hereby **GRANTS** plaintiff's Motion for Leave to File a Sur-Reply and in ruling on the Motion for Summary Judgment has considered all of the arguments presented by both parties in both the summary judgment and sur-reply briefing.

In his First Amended Complaint, plaintiff asserted claims under the Family Medical Leave Act, 29 U.S.C. §§2601 *et seq.*("FMLA"); the Missouri Human Rights Act, Mo.Rev. Stat. §§213.010 *et seq.* ("MHRA"), race related claims under 42 U.S.C. § 1981 and disability related claims under the Americans With Disabilities Act As Amended. 42 U.S.C. §§12101 *et seq.* ("ADAAA"). On March 27, 2019, the Court granted in part Ford's Motion to Dismiss. The claims which remain are the following: Counts I and II – FMLA Interference and Retaliation; Count III – MHRA – Disability Discrimination – Failure to Accommodate (Asthma); Count VI – MHRA – Race Discrimination – Disparate Treatment; Counts VII and VIII – Section 1981 – Race Discrimination and Retaliation. The Court will address each of these counts below.

9

### B. Waiver and Release of Claims Relating to Plaintiff's June 2017 Termination

Ford alleges that on October 2, 2017 plaintiff voluntarily and knowingly executed a Reinstatement Waiver where he agreed to waiver and release all rights which he might have for the period beginning with his termination and ending with his reinstatement.

Plaintiff argues that there is a dispute of fact as to whether he knowingly and voluntarily released his claims. He did not have legal counsel, nor was he able to negotiate the terms of the waiver. The language of the waiver is not clear – it does not make any reference to plaintiff's pending EEOC charge and whether he would be able to maintain that.

In McCray v. Chrysler LLC, No. 4:09-CV-572-CAS, 2010 WL 682306 (E.D.Mo. Feb. 23, 2010), plaintiff signed a release as part of an employee voluntary buyout program. The buyout program released Chrysler from any claims and causes of action that she had against it. The Court stated that in the employment context, courts apply contract principles to determine the validity of a release. The Court noted that in the Eighth Circuit, courts look at the circumstances under which a release was obtained to determine if the release was entered into knowingly and voluntarily. In McCray, plaintiff was mailed an application for the buyout program. The application included a release of claims and a brochure describing the plan. The language of the release stated:

> I agree that, in consideration of EVTEP benefits, if I execute and Chrysler LLC approves this application, *I release, waive and forever discharge Chrysler LLC, its subsidiaries and affiliates ... from any charges, claims, grievances, demands and causes of action under any statute or common law.* This release, however, does not waive (i) any claims for payment of Sickness and Accident Benefits through my separation date that I have filed and that are currently pending under the claims review procedures of

the Group Insurance Program, (ii) claims to enforce the terms of the EVTEP, (iii) back wages and employee benefits that I may be entitled to receive resulting from a currently pending grievance resolved through the collectively bargained grievance procedure, and (iv) claims that arise after my execution of this application.

Id., at *2. McCray was free to consult with an attorney or her local union representative before signing the application and release. The Court found that the release signed by McCray stating that "I release, waive and forever discharge Chrysler LLC . . . from any charges, claims, grievances, demands and causes of action under any statute or common law" was clear, used simple language and the circumstances showed that she knowingly and voluntarily entered into the termination agreement and released her Title VII claims of discrimination. The Court found that this type of general release of all claims has been upheld by the Eighth Circuit in other cases. See e.g. Lancaster v. Buerkle Buick Honda Co., 809 F.2d 539, 541 (8th Cir. 1987); Pilon v. University of Minn., 710 F.2d 466, 467-68 (8th Cir. 1983).

Plaintiff filed his first charge of discrimination against Ford on July 3, 2017. However, nothing in the Waiver references the pending charge of discrimination or indicates whether it was intended to preclude plaintiff from continuing to pursue his charge. The waiver stated only that plaintiff waived and released all rights including back pay, which he may have. The waiver in McCray was much more specific, stating that plaintiff was waiving "any charges, claims, grievances, demands and causes of action under any statute or common law." Id. at *4. Plaintiff argues that because he signed the Waiver without the advice of counsel and because the language was ambiguous, it is reasonable to infer that he did not comprehend the consequences of the waiver. Plaintiff also argues that the waiver's direct connection with the collective bargaining agreement and union grievance process provides additional ambiguity as to

11

the waiver's applicability outside of the labor laws.  Viewing this waiver in the light most favorable to the plaintiff, the Court finds that there is a genuine issue of material fact as to whether plaintiff waived his claims against Ford. Accordingly, the Court will proceed to analyze the remaining arguments in Ford's Motion for Summary Judgment.

### C. Count 1- Interference with FMLA Leave

Plaintiff alleges that Ford interfered with his FMLA leave by telling him that he was ineligible for FMLA leave from December 2016 onward and also by preventing plaintiff from taking FMLA leave to which he was entitled in 2017. Ford argues that plaintiff did not work enough hours (1,250 in 2016) to be eligible to take FMLA in 2017. Plaintiff states that he has no reason to dispute that he fell short of the 1,250 hour eligibility requirement to be able to take intermittent FMLA leave in 2017. Plaintiff does assert though that if Ford had excused his June 3 and June 6, 2016 absences that were ultimately covered, by the FMLA, he *likely* would not have been suspended and *would likely* have accrued enough hours for subsequent FMLA eligibility. Ford states that plaintiff's argument requires a finding that Ford unlawfully interfered with his FMLA rights by suspending him in June 2016 instead of excusing his absences.  But, plaintiff's FMLA claim based on his June 2016 suspension has already been dismissed as time barred. Additionally, Ford states that plaintiff never requested that his June 3 or 6 absences be excused. Ford also states that plaintiff submitted medical documentation from his own physician on June 8, 2016 stating that he was deemed "able to work" since May 31, 2016.  Additionally, Ford states that whether it was "likely" that he would not have been suspended or likely would have accrued enough hours is speculation.

It is "unlawful for any employer to interfere with, restrain, or deny the existence of

or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). In order to assert an FMLA interference claim plaintiff must show: (1) he was eligible for FMLA leave, 29 U.S.C. §§ 2611(2), 2612(a)(1); (2) Defendants were on notice of his need for FMLA leave, 29 C.F.R. 825.302; and 3) Defendants denied his benefits to which he was entitled. Hasenwinkel v Mosaic, 809 F.3d 427, 432 (8th Cir. 2015). In this case, plaintiff admits that since he filed his Complaint, he has reviewed his time records and has subsequently determined that he fell short of the necessary 1,250 hours to qualify for intermittent leave in calendar year 2017. Plaintiff argues that he likely would have qualified for FMLA leave in 2017 if Ford had excused his June 3 and 6, 2016 absences. However, as Ford notes this claim was previously dismissed and plaintiff's belief that he would have qualified is speculation. Accordingly, because plaintiff was ineligible for FMLA leave at any time in 2017, the Court hereby **GRANTS** Ford's Motion for Summary Judgment on Count 1 – FMLA Interference.

### D. Count 2 – Retaliation for taking FMLA Leave

Plaintiff alleges that after taking FMLA leave in 2016 and requests to take leave in 2017, Ford retaliated by suspending his employment in April 2017 and also by terminating his employment in June and October 2017. Ford argues plaintiff cannot establish a prima facie case because the gaps are too long between when he requested FMLA leave and the adverse actions taken. Even if he could establish a prima facie case, Ford has a legitimate reason for the discipline – absenteeism. Ford also argues that plaintiff cannot show pretext. Plaintiff states that temporal connection is just one way to show causation. But, plaintiff does not really explain how any conduct on the part of Ford is linked to plaintiff's request for FMLA leave. Ford argues that plaintiff has

13

failed to show a temporal proximity and has failed to show any other evidence of a causal connection. Ford also argues that plaintiff has failed to come forward with any evidence showing that Ford's reason for his terminations was false and that the decision makers were motivated by discriminatory animus.

"When an employee does not have direct evidence of retaliation, the Court analyzes [his] FMLA retaliation claim under the McDonnell Douglas burden-shifting framework." Beckley v. St. Luke's Episcopal-Presbyterian Hospitals, No. 17-CV-1369 RLW, 2018 WL 2447796 (E.D.Mo. May 31, 2018), aff'd 923 F.3d 1157 (8th Cir. 2019) (citing Phillips v. Mathews, 547 F.3d 905, 912 (8th Cir. 2008)). In Beckley, the Court explained:

> To establish a prima facie case of FMLA retaliation, an employee must show that she engaged in activity protected under the Act, that she suffered an adverse employment action by the employer, and that a causal connection existed between the employee's action and the adverse employment action. . . .If a plaintiff is able to establish a prima facie case of retaliation, the burden shifts to the defendant to come forward with evidence of a legitimate, non-discriminatory reason for the adverse action. . . . This burden is not onerous and the showing need not be made by a preponderance of the evidence. . . .If the defendant does so, the plaintiff must come forward with evidence that creates a triable issue of fact as to whether the asserted reason was pretext for discrimination. . . .Throughout this analysis, the ultimate burden of persuasion remains with the plaintiff to show the termination was motivated by intentional retaliation.

Id. at *3 (internal citations and quotations omitted).

In this case, plaintiff has not come forward with any evidence of direct discrimination. Therefore, the Court will proceed to analyze plaintiff's retaliation claim under the McDonnell-Douglas test. Plaintiff first requested FMLA leave on May 28, 2016. Ford granted plaintiff's leave request on June 24, 2016. Plaintiff was not suspended until April 23, 2017 (almost eleven months later), terminated on June 11,

2017 (over a year later) and terminated after being reinstated on October 18, 2017 (a gap of more than sixteen months). Plaintiff requested intermittent FMLA leave for calendar year 2017 in December 2016 and repeated this request again each month until March 2017. The smallest time gap would be two months, assuming that plaintiff last requested leave in March 2017 and was suspended on April 23, 2017. For purposes of this motion, the Court will assume that there is a causal connection between plaintiff's FMLA request and his suspension. Ford's legitimate non-discriminatory reason for suspending and terminating plaintiff was his excessive absenteeism. As to the April 23, 2017 suspension, plaintiff was absent beginning April 1, 2017. He incurred two chargeable absences when Unicare denied his request for a medical leave of absence after he failed to timely furnish the necessary medical documentation. The one month suspension was consistent with the NAP. During his suspension, the Union faxed medical documentation to Unicare reflecting that Plaintiff was unable to perform work duties from April 1 to April 8, 2017 but could resume working on April 9, 2017. As a result, plaintiff's medical leave was approved for that time period. However, because plaintiff did not return to work until April 15, 2017, he still incurred two chargeable absences and his one month suspension was continued. Plaintiff served his one month suspension from April 23, 2017 to May 25, 2017 and returned to work on May 26, 2017. On June 10, 2017, plaintiff called in sick as a result of an asthma attack. On June 11, 2017, when plaintiff attempted to return to work, Labor Relations informed him that his employment had been terminated due to absenteeism. Josh Hartung and plaintiff's union representative explained to plaintiff that he could not use paid personal time to excuse his absence because he had just returned from a suspension for absenteeism.

Ford would have excused the June 10, 2017 absence if his Team Manager would have approved it, but plaintiff never requested that it be excused. As Ford has offered a legitimate non-discriminatory reason for the suspension and termination, the burden shifts back to plaintiff to demonstrate pretext. In Ebersole v. Novo Nordisk, Inc., 758 F.3d 917, 925 (8th Cir. 2014), the Court stated:

> An employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.

"[T]he plaintiff's burden to demonstrate pretext requires 'proof of an impermissible discriminatory animus' demonstrating the employer's decision resulted from 'intentional discrimination.'" Cloke v. Federal-Mogul Ignition Co., No. 3:18-cv-00006-RGE-CFB, 2019 WL 3976324, *9 (S.D.Iowa May 21, 2019) quoting Lovland v. Employers Mut. Cas. Co., 674 F.3d 806, 811-12 (8th Cir. 2012). Plaintiff in this case has offered no evidence of any discriminatory animus. Indeed, in response to the summary judgment motion, plaintiff does not offer any reason why his excessive absenteeism was not the true reason for his suspension and terminations. Accordingly, the Court hereby **GRANTS** Ford's Motion for Summary Judgment on Count 2 (FMLA Retaliation).

### E. Count 3 – MHRA Disability Discrimination – Failure to Accommodate

Ford argues that plaintiff's asthma is not a disability under the MHRA because it is mild, intermittent, can be controlled and does not limit one of plaintiff's major life activities. Secondly, plaintiff cannot show that his desired accommodation (taking intermittent leave) does not interfere with performing his job or make him qualified to perform the essential functions of the job. "FMLA leave is not a reasonable

16

accommodation under the ADA." Additionally, Ford argues that Plaintiff did not make a request for an accommodation in connection with his AWOL absence on June 10, 2017. Even if he could establish the first two elements, he cannot show that Ford terminated him *because of* his disability.

Plaintiff argues that his asthma limits his ability to breath when it is active. Plaintiff also states that there is considerable evidence that shows that Ford does not uniformly enforce attendance expectations, and this creates a material factual dispute over the essentialness of attendance for plaintiff's position. Plaintiff also argues that there is a dispute of fact as to whether he disclosed that his June 10, 2017 absence was a result of an asthma attack. Plaintiff argues that his testimony combined with his history of providing medical documentation to Ford and his attempts to arrange for intermittent leave create a triable issue of fact as to whether he requested an accommodation on June 11, 2017.

In reply, Ford argues that plaintiff has failed to show that his asthma was a disability under the MHRA because when he used his inhaler, it was controllable. Ford also argues that plaintiff's argument that regular attendance was not an essential function of the job because so many of his co-workers exceeded the chargeable absence limit is without merit. Ford argues that simply counting the number of "A" codes does not establish whether the absence was chargeable or how many absences were consecutive. Ford also states that plaintiff did not request a reasonable accommodation either in advance or during his termination meeting on June 11. Plaintiff did not submit any medical documentation covering his absence or indicating that it was asthma related, there was no discussion about his asthma, and he did not

ask his Team Manager to excuse his absence after the fact. Finally, Ford argues that

even if plaintiff could show these elements, he has failed to come forward with any

evidence showing that Ford terminated him because of his disability.

> To state a claim under the MHRA, the plaintiff must show that [h]e is "(1) disabled within the meaning of the MHRA, (2) qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) suffered an adverse employment action because of [his] disability." Olsen v. Capital Region Medical Center, 713 F.3d 1149, 1154 (8th Cir. 2013). Under the MHRA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job." R.S.Mo. § 213.010(4). Courts interpreting the definition divide it into two parts: (1) the person must have an impairment that limits major life activity; and (2) with or without reasonable accommodation, that impairment must not interfere with performing the job. Lomax v. DaimlerChrysler Corp., 243 S.W.3d 474, 480 (Mo. App. E.D. 2007). Under Missouri's state regulations, "major life activities" are defined as "those life activities which affect employability such as communication, ambulation, self-care, socialization, education, vocational training, employment and transportation. 8 C.S.R. § 60-3.060(1)(C). Minor temporary problems (such as broken bones, sprains, or colds) are not considered impairments resulting in disability. 8 C.S.R. § 60-3.060(1)(B)(1).

Clark v. YRC Freight, No. 4:14-CV-00668-FJG, 2016 WL 918047, at *10 (W.D. Mo. Mar.

8, 2016).

Plaintiff argues that he is disabled under the MHRA due to his asthma condition.

Plaintiff's asthma is sporadic, it can flare up depending on his environment. When his

asthma flares up it causes constriction in his lungs which results in wheezing and

labored breathing. When his asthma flares up, using his inhaler or breathing treatment

alleviates his symptoms most of the time. Other than when he is having a flare-up,

plaintiff's asthma does not limit his ability to work and plaintiff has never maintained

active work restrictions related to his asthma. Plaintiff argues that because his asthma

interferes with his ability to breathe when his is having a flare up, the time periods

between his flare-ups is irrelevant, as the flare-ups are acute when they occur. In Equal

Employment Opportunity Commission v. Crain Automotive Holdings, LLC, 372

F.Supp.3d 751 (E.D.Ark, Apr. 11, 2019), the Court noted:

> [b]efore the 2008 amendments to the ADA, courts strictly interpreted the
> terms "major life activities" and "substantially limits," creating a demanding
> standard for qualifying as disabled. See Nyrop v. Independent Sch. Dist.
> No. 11, 616 F.3d 728, 734 (8th Cir. 2010). The 2008 amendments,
> however, "broadened the definition of what constitutes a disability and
> rejected the strict standards" from before. Id. at 734, n. 4; see also 29
> C.F.R. § 1630.2(h). Now, "substantially limits" is not demanding, and it
> "shall be construed broadly in favor of expansive coverage." 29 C.F.R. §
> 1630.2(j)(i).

Id. at 755. In that case, the defendant argued that because plaintiff did not

constantly suffer panic attacks and could handle other stressful activities, she

was not disabled. However, the Court noted that "if an impairment is episodic, it

'is a disability if it would substantially limit a major life activity when active." Id.

quoting 29 C.F.R. § 1630.2(j)(1)(vii). So, even though plaintiff's asthma attacks

were intermittent, the Court finds that because they limited his ability to breathe

when they occurred, that they were a physical impairment that limited one or

more of his major life activities and thus plaintiff meets the definition of disabled

under the MHRA.

The second prong of the prima facie case is that plaintiff was qualified to perform

the essential functions of his job with or without a reasonable accommodation. In Lipp

v. Cargill Meat Solutions Corp., 911 F.3d 537, 545 (8th Cir. 2018), the Court stated,

"'regular and reliable attendance is a necessary element of most jobs.' Greer v.

Emerson Elec. Co., 185 F.3d 917, 921 (8th Cir. 1999)(quoting Nesser v. Trans World

Airlines, Inc., 160 F.3d 442,445 (8th Cir. 1998). The ADA provides that 'consideration shall be given to the employer's judgment as to what functions of a job are essential.' 42 U.S.C. § 12111(8)." As discussed earlier, Ford maintains a National Attendance Policy. In a letter describing implementation of the NAP, it was noted that during the 2015 negotiations between Ford and the Union, the negative effects of absenteeism were discussed, and it was agreed that "it is essential for everyone to contribute in order to ensure future competitive viability and job security." As a result, the parties agreed that a new NAP would be part of the Collective Bargaining Agreement and would be consistently applied at all locations. (Plaintiff's Ex. 6). Thus, the Court finds that attendance was an essential element of plaintiff's position as an hourly worker at KCAP.

Plaintiff argues that there is a genuine dispute of fact as to whether Ford could have reasonably excused his June 10, 2017 absence. The NAP follows a schedule of progressive discipline for chargeable absences. Attendance related discipline progresses from R&W (reprimand and warning) plus a one day suspension for the 5th chargeable absence to R&W plus a one week suspension for the 6th chargeable absence, to R&W plus two weeks for the 7th chargeable absence, to R&W plus one month for the 8th chargeable absence to termination for the 9th chargeable absence. Employees who incur an AWOL or other chargeable absence (except "MC" codes) and who have excused absence allowance time available (paid personal time) can use such time after-the-fact to excuse their absence *if* the employee has no discipline for absenteeism on their record at the time of the absence. Employees can also ask their supervisors to excuse an absence after-the-fact to avoid a penalty of two weeks or less. The decision of whether to excuse an absence is left to the supervisor's discretion. If the

20

employee's next level of penalty is a one-month suspension or termination, the

employee must receive approval from a higher level supervisor in order to excuse the

absence after the fact. In plaintiff's case, his last penalty for absenteeism was R&W +

one month given on April 23, 2017. (Weatherly Deop. p. 133). Thus, because plaintiff

had discipline for absenteeism on his record he was not able to use his paid personal

time to excuse his June 10th absence after the fact. (Ford SOF 92; Edwards Depo. p.

139-140). Both Josh Hartung and Leon Allen, the union representative, explained this to

plaintiff.

> Q. Your union rep explained to you there was nothing he could do
> about it because you had incurred the AWOL on June 10th and although
> you had personal time, he explained to you that you could not use it
> because you had just gotten back from suspension?
> A. That's correct.
> Q. Did you have any reason to believe what your union rep was
> telling you was incorrect?
> A. No, I didn't.
> Q. Sitting here today, do you believe what your union rep told you
> was correct?
> A. I believe it was correct.
> Q. Do you remember anything that Mr. Hartung – I'm sorry. Was
> Josh Hartung the labor relations rep who administered your termination?
> A. Yes, he was.
> Q. Do you recall any discussions with him? Do you remember
> anything he said?
> A. He just let me know I was about to be terminated due to
> absenteeism, and that's it.
> Q. Did you say anything to him that you can recall?
> A. I think I just let him know I had time, but then he let me know that
> I couldn't use it because I had just got back from suspension less than 30
> days ago.
> Q. So he told you something consistent to what your own union rep
> told you?
> A. Yes, that's correct.
> Q. Is there anyone else you spoke to at Ford Motor Company,
> either on June 10 or June 11, other than Mr. Hartung and your union rep?
> A. No, not that I recall.
> . . .
> Q. You didn't ask your supervisor or process coach to excuse your

absence on June 10th; correct?
     A. No, I didn't.

(Weatherly Depo. 136-138).

Plaintiff also argues that the NAP does not entitle Ford to summary judgment because there is considerable evidence that shows that the policy was not uniformly enforced, and that the overwhelming absenteeism incurred by employees creates a material factual dispute over the essentialness of attendance. In support of this assertion, plaintiff cites to the attendance records of plaintiff's co-workers who worked the same shift and in the same department. Plaintiff argues that the AWOLs or "A" codes incurred by these employees in a twelve month period far exceeded the chargeable absence limit as defined by the NAP. Ford argues that simply counting the "A" codes is meaningless, as it does not establish whether an absence was chargeable, how many chargeable absences were consecutive, whether the employee was eligible for termination or whether the employee was present to be disciplined.

The Court agrees and finds that there is no dispute of fact that plaintiff was not qualified to perform the essential functions of his position. Attendance was an essential function of plaintiff's position at the KCAP. In Lipp, the Court found that plaintiff was not a qualified individual because she was unable to show at the time she was terminated that she could regularly and reliably attend work, which was as essential function of her employment. "This court has consistently stated that 'regular and reliable attendance is a necessary element of most jobs.'" Id. at 544 (quoting Greer,185 F.3d at 921). Additionally, the Court finds that plaintiff's counting of the "A" codes does not show that the policy was not uniformly enforced or that attendance was not an essential function of the position, as there are far too many variables that could explain why a code was

22

listed as "A".

Plaintiff argues that there is a genuine dispute of fact as to whether he could have performed the essential functions of his position with an accommodation. Plaintiff states that his testimony combined with his history of providing medical documentation to Ford and his attempts to arrange for intermittent FMLA leave, create a dispute of fact as to whether he disclosed that his June 10, 2017 absence was the result of an asthma attack and whether he requested an accommodation for this absence. In Crain Automotive Holdings, 372 F.Supp.3d 751, the Court noted:

> [t]he Eighth Circuit has explained that in requesting an accommodation, a disabled employee is not required to use magic words like reasonable accommodation, but must make it clear to the employer that the employee wants assistance for his or her disability. . . .An employee need only provide[ ] the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.

Id. at 757 (internal citations and quotations omitted). In Lipp, the Court stated,

> [u]nder the ADA, a request for a medical leave of absence might, *in some circumstances,* be a reasonable accommodation. . . .An individual requesting an accommodation must make a facial showing that reasonable accommodation is possible and that the accommodation will allow her to perform the essential functions of the job. . . .But the ADA does not require employers to provide an unlimited absentee policy.

Id. at 545-546 (internal citations and quotations omitted). In Lipp, the Court found that plaintiff's desired accommodation of additional flare-up related absences without providing timely medical verification following several days of unplanned absences "was not one [ ]that would enable her to perform the essential function[ ] of regular and reliable attendance, but would *relieve* her of [that] function [ ]." Id. at 546 (internal citations and quotations omitted). In the instant case, plaintiff testified as follows:

23

Q. Were you in fact absent from work on June 10, 2017, although you were scheduled to work?

A. Due to my disability, yes, I was.

Q. Again, I'm not asking why yet but you were absent from work that day, Correct?

A. That's correct.

Q. Did you schedule your absence in advance?

A. No, I didn't.

Q. Did you get pre-approval for your absence?

A. No, I didn't.

Q. Did you obtain any documentation excusing you from work on the 10th of June?

A. No, I didn't.

Q. Why did you not come to work June the 10th?

A. Due to my disability, I had an asthma attack. Because the week prior, my fans were off for three of my four working days. My fan wasn't working so I really had a hard time breathing. And I notified them from Friday up until Sunday about that they did nothing about it until that Monday. So it was towards the end of the day when they did it on Monday so I ended up having an asthma attack, and that's ultimately why I missed work on the 10th of June, 2017.

Q. Did you go see your Doctor on June 10th?

A. No, I didn't.

Q. Did you obtain any medical documentation from your doctor excusing your absence on June 10th?

A. No, I didn't.

Q. Did you submit any medical documentation to Ford regarding your absence on June 10th?

A. No, I didn't.

Q. So just to be clear, you stayed home on June the 10th but you did not get that time off excused via any documentation, correct?

A. That's correct.

(Weatherly Depo. pp. 134-135). As discussed earlier, plaintiff testified that when

he spoke with Josh Hartung, he let him know that he had paid personal leave

time that he thought was available to use in order to excuse the absence after

the fact. However, Mr. Hartung informed plaintiff that was not available, as he

had just returned from being suspended less than 30 days ago. The Court finds

that there are no disputed facts, plaintiff's testimony clearly shows that he did not

request an accommodation for his June 10, 2017 absence. Even if he had

24

requested this, an unlimited absentee policy is not a reasonable accommodation. Higgins v. Union Pacific Railroad Co., 931 F.3d 664, 672 (8th Cir. 2019)(finding plaintiff's requested accommodation amounted to an "unlimited absentee policy," which is unreasonable as a matter of law). See also Pickens v. Soo Line R.R. Co., 264 F.3d 773, 777 (8th Cir. 2001)(finding employee's request to "work only when he fees like working . . .unreasonable as a matter of law"); Buckles v. First Data Res., Inc., 176 F.3d 1098, 1101 (8th Cir. 1999)(finding employee's request for the "[u]nfettered ability to leave work at any time" to be an unreasonable accommodation). Thus, because plaintiff has failed to state a prima facie case for his failure to accommodate claim under the Missouri Human Rights Act, the Court hereby **GRANTS** Ford's Motion for Summary Judgment on Count 3.

### F. Count 6 – MHRA Race Discrimination – Disparate Treatment – June 11, 2017 Termination.

Ford argues that plaintiff cannot establish a prima facie case because 1) he was not meeting legitimate job expectations and 2) he has no evidence that white employees were treated more favorably. Even if plaintiff could establish a prima facie case, Ford had a legitimate reason for terminating plaintiff's employment – absenteeism. Ford also argues that plaintiff cannot prove pretext.

Plaintiff argues that the McDonnell test does not apply to plaintiff's MHRA count and plaintiff only has to show that his race was a *contributing factor.* Plaintiff argues that summary judgment is improper because there is a genuine dispute as to whether his absenteeism was the *sole* reason for his June 2017 termination, because the NAP was not applied equally to all employees. Plaintiff's counsel in Exh. 12 compiled absenteeism data for 40 employees from April 1, 2017 to April 1, 2018, who worked in

25

the same department and on the same crew as plaintiff and who incurred more than 9 absences. Of these 40 employees, only one employee was discharged, and that employee was African-American. Plaintiff argues that summary judgment is improper because there is a genuine dispute as to whether his absenteeism was the sole reason for his June 2017 termination.

Ford argues in reply that simply counting the AWOL codes in the raw attendance data does not establish whether those "A" (AWOL) codes were truly chargeable absences, because the employee might have later secured a medical leave covering those absences. Additionally, Ford states that simply counting the "A" codes is not enough to determine if an employee was eligible for discharge because under the NAP, as the next disciplinary penalty is not skipped over regardless of how many consecutive days an employee is AWOL. So, employees can incur significantly more than nine chargeable absences before becoming eligible for discharge under the NAP. Ford also states that even if plaintiff's method of simply counting the codes was valid, Ex. 12 reflects that 19 white and 18 black employees were not discharged for absenteeism under the NAP. Finally, Ford argues that even if all the A codes were chargeable absences, plaintiff has failed to establish that any of the white hourly employees were similarly situated to him. Plaintiff has failed to show how many chargeable absences were consecutive, whether the employees were present at the plant after having become eligible for discharge and the penalty level that the employee was at under the NAP when any of the chargeable absences were incurred. Also, plaintiff has failed to present evidence that any of the purported comparators dealt with the same supervisor as plaintiff did while he worked in the Truck Chassis department or that the same

26

decision maker (Josh Hartung) was involved in determining whether to administer discipline against any of the other employees. Ford also states that plaintiff has failed to come forward with any evidence that the real reason for plaintiff's termination – absenteeism- was false and that Mr. Hartung was motivated by a discriminatory animus.

Plaintiff argues in a sur-reply, that the raw attendance data may be authenticated at trial. Additionally, plaintiff states that this raw data is merely a starting point to demonstrate the excessive absences incurred by Ford employees within a 12 month period. Plaintiff argues that if Ford disagrees with the accuracy of its own attendance data, then it must cite to specific evidence to show the chargeable absences of the employees listed in Ex. 12 are in dispute. Plaintiff also argues that the absence data of twenty-seven employees remains uncontroverted and that Ford has not produced enough evidence to sufficiently controvert the chargeable absence and discipline data contained in plaintiff's Exh. 12 and therefore cannot use the NAP as a legitimate reason for bypassing plaintiff's race discrimination claim.

In Cooper v. KSHB-TV 41, No. 17-0041-CV-W-BP, 2018 WL 8131234 (W.D.Mo. Apr. 2, 2018), the Court noted:

> [u]ntil 2017, Missouri courts held that an employment decision was "because of" the plaintiff's race if the plaintiff's race was a "contributing factor" in the employment decision at issue. In 2017, and after Plaintiff's suit was filed, the Missouri Legislature amended the MHRA to include a definition clarifying that the phrase "because of" means "the protected criterion was the motivating factor." Mo.Rev.Stat. § 213.010(2).

Id. at *5.

In Marshall v. Walgreen Co., No. 4:18-CV-331-CDP, 2018 WL 3025813, *2 (E.D.Mo. June 18, 2018) the Court stated, "[u]nder federal law, an employee's claim of discrimination accrues when the alleged discriminatory action occurs,

*e.g.*, for wrongful discharge, when the employee is fired. 'At that point . . .he has a complete and present cause of action.' Green v. Brennan, 136 S.Ct. 1769, 1777 (2016)." The amendment to the MHRA went into effect on August 28, 2017. Because plaintiff's claims in Count 6 relate to his termination on June 11, 2017, before the amendment went into effect, the McDonnell Douglas burden shifting analysis does not apply to plaintiff's claim for race discrimination and plaintiff need only show that there is a genuine dispute as to whether his race was a "contributing factor" in his termination. In Jain v. CVS Pharmacy, 779 F.3d 753 (8th Cir. 2015), a case decided before the 2017 MHRA amendment, the Court stated:

> The MHRA prohibits employers from discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment because of her race or national origin. See Mo.Rev.Stat. § 213.055(1)(a). These safeguards are not "identical to the federal standards and can offer greater discrimination protection." Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818–19 (Mo. 2007). Unlike Title VII of the Civil Rights Act of 1964, a MHRA discrimination claimant can avoid summary judgment by showing that her race or national origin was a contributing factor rather than a substantial factor in the employer's decision. Hill v. Ford Motor Co., 277 S.W.3d 659, 665 (Mo. 2009). Courts have defined a "contributing factor" as one that "contributed a share in anything or has a part in producing the effect." E.g., Holmes v. Kan. City Mo. Bd. of Police Comm'rs ex rel. Its Members, 364 S.W.3d 615, 627 (Mo.Ct.App. 2012).

Id. 779 F.3d at 759.

Plaintiff relies on the Ford's attendance data in Exhibits 12 and 13 to show that for the time period April 1, 2017 – April 1, 2018, there were forty employees who worked on the same shift, in the same department, who incurred 9 or more chargeable absences, but instead of all of these forty employees being terminated, only one employee was discharged, and this individual was also African American. Plaintiff

28

argues that this shows that there is a genuine dispute as to whether his absenteeism was the sole reason for his June 2017 termination. However, as discussed above, simply counting the AWOL codes in the raw attendance data does not establish whether those "A" codes were truly chargeable absences, because the employee might have later secured a medical leave covering those absences, but that A code may not have been changed in the system. Additionally, simply counting the "A" codes is not enough to determine if an employee was eligible for discharge because under the NAP, the next disciplinary penalty is not skipped over regardless of how many consecutive days an employee is AWOL. So, employees can incur significantly more than nine chargeable absences before becoming eligible for discharge under the NAP. Ford argues that without any verification that the "A" codes for these employees were truly chargeable, the evidence is inaccurate and inadmissible.

In his deposition plaintiff was asked what facts or information he had to suggest that his race played a part in his termination.

Q. Okay. What information do you have – or what facts or information do you have to suggest that your termination was because you're black as opposed because of your record?
A. I don't have any documentation. It was just what I saw when I was getting terminated.
Q. Okay. What did you see?
A. A fellow co-worker that worked there in the plant, I'm not sure where, they apparently had 108 AWOLs and here I was with the minimum amount that would get you terminated and I'm being terminated and this person was a Caucasian male. And so that's what made me feel racially discriminated.
Q. Anything else that makes you feel like your termination was because of your race other than seeing a Caucasian male who you believe had lots of AWOLs?
A. Other than that, no.
Q. This Caucasian male, did you speak with this person?
A. No, I did not.
Q. Do you know anything about this person's history or record?
A. No, I do not.
Q. Do you know if this person took medical leaves of absence?

29

A. No, I do not.

Q. Do you know anything about the facts and circumstances of this individual's attendance at Ford Motor Company or discipline record?

A. No, I do not.

Q. So, other than seeing this person who you don't know who it is and don't know anything about, no other reason why you think that your termination was based on your race; correct?

A. That's correct.

Q. You mentioned suspensions and disciplinary actions. Same question. What information, facts, knowledge, documents, anything, do you have to support any contention or claim that Ford took disciplinary action or suspensions against you because of your race?

A. I have no facts.

(Plaintiff's Dep. Pp. 251-52).

The Court finds that the raw attendance data offered by plaintiff does not show that race played a part or contributed in any way to plaintiff's termination. Additionally, plaintiff's testimony reveals that other than his speculation that one other employee might have been treated more favorably than he was, he has no facts or evidence supporting his claim that his race was a contributing factor in Ford's decision to terminate him on June 11, 2017. Accordingly, Ford's Motion for Summary Judgment on Count 6 is hereby **GRANTED**.

**G. Count 7 – § 1981 – Race Discrimination –October 18, 2017 termination.**

Ford argues that plaintiff cannot show 1) he was meeting legitimate job expectations or 2) that white employees were treated more favorably. Ford had a legitimate reason to discharge plaintiff – violation of the reinstatement waiver. There is no evidence of pretext.

Plaintiff argues that a reasonable inference can be drawn from Ford's discipline and attendance data that white employees were treated more leniently than black employees. Plaintiff argues that because there is circumstantial evidence that he would

not have been terminated if white, the Court should deny summary judgment.

Ford argues that plaintiff's data that he relies on is even more improper here, because plaintiff was assigned to the Transit-Chassis, B Crew in October 2017, whereas plaintiff's Ex. 12 involves hourly employees from a different vehicle, area and crew/shift. Also, plaintiff failed to present evidence that the purported comparators dealt with the same supervisor as plaintiff did, that the same decision-maker, Kim Eads was involved in determining whether to administer discipline against any of the other employees and/or that any of the purported comparators were on a General Reinstatement Waiver. Also, Ford states that plaintiff has failed to come forward with evidence that that reason for his termination – absenteeism – was false and that Ms. Eads was motivated by a discriminatory animus.

In Stone v. McGraw-Hill Global Educ. Holdings, LLC, 126 F.Supp.3d 1077 (E.D.Mo. 2015), the Court stated:

> To establish a prima facie case for racial discharge under Title VII and §
> 1981, Plaintiff must show: "(1) he belongs to a protected class; (2) he was
> qualified for his position . . .; (3) he was discharged; and (4) the discharge
> occurred in circumstances which give rise to an inference of unlawful
> discrimination." Johnson v. A T & T Corp., 422 F.3d 756, 761 (8th
> Cir.2005),

Id. at 1086–87. In the instant case, the Court finds that plaintiff has not stated a prima facie case of discrimination because was not qualified for his position as he was not meeting Ford's legitimate job expectations at the time of his discharge. At the time of his discharge, plaintiff was on probation for having excessive absences and progressive discipline on his record. Even assuming that plaintiff could state a prima facie case, Ford articulated a legitimate non-discriminatory reason for terminating his employment on October 18, 2017 – his absenteeism and violation of the reinstatement waiver.

When plaintiff left work on October 16, 2017, due to back pain, he understood that if he did not open a medical leave of absence or secure approved time off via a paid personal day, unpaid personal day, vacation day or family day, that he would incur a chargeable absence. However, plaintiff did not open a medical leave of absence and never requested or scheduled any personal time off, vacation or family leave in October 2017. Plaintiff also did not ask his process coach to cover or excuse his absence. The only argument that plaintiff makes in response is that a reasonable inference can be drawn from the same attendance and discipline data showing that white employees were treated more leniently than black employees and this creates an inference that plaintiff was terminated because of his race. Ford argues plaintiff's reliance on the attendance and discipline data is not applicable in relation to his October termination, because when plaintiff was reinstated in early October, he was assigned to the Transit-Chassis, B Crew, involving hourly employees from a different vehicle, area and crew/shift from his earlier position. The Court agrees and finds that plaintiff has failed to state a prima facie case of discrimination under §1981 or to show that there were circumstances that created an inference of discrimination in relation to his October 18, 2017 termination. Accordingly, Ford's Motion for Summary Judgment on Count 7 - §1981 - Race Discrimination – October 18, 2017 Termination is hereby **GRANTED**.

### H. Count 8 – §1981 – Retaliation

In Count Eight, plaintiff argues that Ford retaliated against him for filing a Charge of Discrimination. Ford argues that plaintiff cannot establish a causal connection between when he filed his charge of discrimination (July 3, 2017) and when he was terminated for the second time (October 18, 2017). Ford argues that plaintiff was

32

reinstated *after* he filed his Charge which breaks any causal chain. Also, the temporal

gap of three months between when Ford received notice of his charge on July 17, 2017

and his termination on October 18 is too great to support a causal connection.

Additionally, the decision maker for plaintiff's second termination - Kim Eads did not

have knowledge of the Charge prior to terminating plaintiff's employment, so plaintiff

cannot show that this was a "contributing factor" in his termination.

      In opposition plaintiff only states that he has established that a genuine issue of

material facts exists as to whether black employees were treated differently than white

employees and as to whether Ford's proffered rationale for terminating plaintiff was

pretextual.

      In McClure v. Little Rock School Dist., No. 4:17CV00424JLH, 2019 WL

1601353, *2 n.1 (E.D. Ark. Apr. 15, 2019), the court noted that the same analysis is

applied to Section 1981 retaliation claims as to Title VII retaliation claims, and Title VII

cases provide guidance regarding Section 1981 claims. In order to establish a prima

facie case of retaliation on his §1981 claim, plaintiff must show:

> "(1) that he[ ] engaged in statutorily protected activity; (2) an adverse
> employment action was taken against him[ ]; and (3) a causal connection
> exists between the two events." Gilooly v. Mo. Dep't of Health and Senior
> Servs., 421 F.3d 734, 739 (8th Cir.2005). [Defendant] would then have to
> show a "legitimate, non-retaliatory reason" for the adverse action. Takele,
> [v. Mayo Clinic], 576 F.3d at 839. [Plaintiff] then ha[s] to show by a
> preponderance of the evidence that [defendant's] proffered reason was
> pretextual. Tyler v. Univ. of Ark. Bd. of Trs., 628 F.3d 980, 986 (8th
> Cir.2011).

Sayger v. Riceland Foods, Inc., 735 F.3d 1025, 1030–31 (8th Cir. 2013). Filing a charge

of discrimination constitutes engaging in a statutorily protected activity. Plaintiff did

suffer an adverse action when he was terminated on October 18, 2017. However, the

Court finds that there is no causal connection between the two events. Plaintiff filed his

charge of discrimination on July 3, 2017 and on October 2, 2017, Ford reinstated plaintiff. Plaintiff was terminated a second time, just sixteen days later on October 18, 2017, but as discussed above, this was for an unexcused absence in violation of the reinstatement waiver. Even if it could be assumed that there was a causal connection between the filing of the charge of discrimination and plaintiff's second termination, the Court still finds that plaintiff has failed to come forth with any evidence showing that Ford's reason for terminating him – violation of the absenteeism policy and the reinstatement waiver was pretextual.  Accordingly, because plaintiff has failed to state a prima facie retaliation claim, the Court hereby **GRANTS** Ford's Motion for Summary Judgment on Count 8 - § 1981 Retaliation Claim.

### IV. CONCLUSION

Accordingly, for the reason stated above, the Court hereby **GRANTS** Ford's Motion for Summary Judgment (Doc # 66) and **GRANTS** Plaintiff's Motion for Leave to File a Sur-reply in Opposition to Defendant's Motion for Summary Judgment (Doc. # 77).


Date: March 26, 2020                                          **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                                         Fernando J. Gaitan, Jr.
                                                             United States District Judge